Mr. Justice CAMPBELL
 

 delivered the opinion of the court.
 

 The plaintiff, (Quigley,) a citizen of Delaware, complained of the defendants, “ a body corporate in the State of Maryland, by a law of the; General Assembly of Maryland,”' for'the publication of a libel by them, in which his capacity and skill.
 
 *208
 
 as. a mechanic and builder of depots, bridges, station-houses, and other structures for railroad companies, had been falsely and maliciously disparaged and undervalued. The defendants pleaded the general issue. On the trial of the cause, it appeared that in 1854, the president and directors, then in charge of the affairs of the defendants, instituted an inquiry into the administration and management of a person who had been the superintendent of their railroad for ten years. Among other subjects, the nature of his connection and dealings with the plaintiff, who had likewise been in the service of the corporation as “ general foreman of all their carpenters,” engaged the attention of the committee- oT investigation. • The president of the company, who conducted the inquiry before this committee on behalf of the corporation,.-seems to have been convinced that-, the superintendent had exhibited partiality for the plaintiff, and had allowed-,him extravagant compensation for service, and the privilege of free transit over the road for himself, his workmen, and freight,-to' the detriment of the company, and. in breach of his duty as superintendent. The superintendent defended himself against these and other impu i tatións, and produced testimony -to the skill and fidelity of the plaintiff while in the service of the company; also, to the value of his services, and to..the effect that.no unusual or improper favor had been extended to him.
 

 The president of the company,,in the course of the investí-' gation, addressed' a letter to an architect, who had some -acquaintance with the, plaintiff, to request his "opinion of his skill as a mechanic, and' whether the sendees of the plaintiff could have had any peculiar value to' a-railroad company. The reply of this architect was very.pointed and depreciative of the plaintiff,‘affirming that- “he.was not entitled to rank as a third-rate workman,” and “was unable to make -the simplest
 
 geometrical
 
 calculations.” All the testimony collected by the committee, as produced by the superintendent, was carefully reduced to writing, and printed; first, for the use. of the president and directors, and afterwards was submitted to the company at their meeting on the-8th of January; 1855, .with a report, which exonerated in.á great' measure the superintendent
 
 *209
 
 from any mal-practice in consequence of his relations with the. plaintiff. The investigation was searching, and testimony, which, with the report of the committee, fills two printed volumes, was submitted to the company. The letter of the architect, in answer to the letter of the president, is printed- in one of these volumes, and this publication is the- libel complained of. Several of the directors testify they were not aware of the' publication, and evidence was adduced that the plaintiff had declared that the investigation had resulted in increasing, his business’. A verdict was returned in favor of the plaintiff. The defendants are a company incorporated by the Legislatures of Delaware and Pennsylvania, as well as of Maryland, to construct a railroad to connect the three cities which contribute to form its name, and a portion of their directors and stockholders are citizens of Delaware.
 

 The defendants contend that they are not liable to be sued in this action; that theirs.is a railroad corporation, with defined and limited faculties and powers, and having only such incidental authority as is necessary to- the full exercise of the faculties and powers granted by their charter; that, being as mere legal entity,' they are ineapable of malice, and that malice is a necessary ingredient in a libel; that this action should have been instituted against the natural persons who were concerned in the publication of the libel. To support this argument, we should be required to concede that a corporate body could only act within the limits and. according to the faculties determined by the act of incorporation, and therefore that no crime or offence can be imputed to it. That although illegal acts might be committed for the benefit or within the service of the corporation, and to accomplish'objects for which it was created by the direction of their dominant body, that such acts, not being contemplated by the charter, must be re-, férred to the rational and sensible agents who performed them, and the whole responsibility must be limited to those agents, and we should be forced, ás a legitimate' consequence, to conclude that no action
 
 ex delicto
 
 or indictment will lie against a corporation for any misfeasance. But this conclusion would be entirely inconsistent with the legislation and jurisprudence'
 
 *210
 
 of- the States of the Union relative to these artificial persons, Legislation has. encouraged their organization, as they concentrate and employ the intelligence, energy, and capital of society, for the development of enterprises of public utility. There is scarcely an object of general interest for which some association. has not been formed, and there are institutions whose members are found in every part.of the Union, who contribute their efforts to the common object. To enable impersonal .beings — mere legal entities, which exist only in contemplation of law — to perform corporal acts, or deal with, personal agents, the principle of representation has been adopted as a part of their constitution. The powers x>f the corporation aré placed in the hands of a governing body selected by the members, who manage its affairs, and who appoint the agents that exercise its faculties for the accomplishment of the object of its being. But these, agents may infringe the rights.'of persons who are unconnected with the corporation, or who are brought into relations of business or intercourse with it. As a necessary correlative to the principle of the exercise of corporate powers and faculties by legal representatives, is the recognition of a corporate responsibility for the acts of those representatives.
 

 With much wariness, and after close and exact scrutiny into the nature of their constitution, have the judicial tribunals determined the legal relations which are established for the corporation by their governing body, and their agents, with the natural persons with whom they are brought into contact or collision. The result of the cases is, that for acts done by the agents of a corporation, either
 
 in contractu
 
 or
 
 in delicto,
 
 in the course of its business, and of their employment, the corporation is responsible, as an individual is responsible under similar circumstances. At a very early period, it was decided in Great Britain, as well as in the United States, that .actions might be maintained against corporations for torts; and instances may be found, in the judicial annals of both countries, of suits for torts-arising from the acts of their agents, of nearly every variety.
 
 Trespass guare clausum fregit
 
 was supported in 9 Serg. and R., 94; 4 Mann. and G., 452; Assault and Battery, 4 Gray Mass. R., 465; 6 Ex. Ch., 314. For damages by a col
 
 *211
 
 lision of rail-cars and steamboats, 14 How., 465; 19 How., 543 Eor a false representation, 34 L. and Eq. R., 14; 11 Wheat., 59
 

 The case of the National Exchange Co. of Glasgow
 
 v.
 
 Drew, (2 Macqueen H. of L. Cas., 103,) was that of a company in failing circumstances, whose managers sought to appreciate its stock by a fraudulent representation to the company, and a publication of the report as adopted by it, that its affairs were prosperous. Two of its stockholders were induced to borrow money from the company to invest in its stock. The question in the cause was, whether the company was responsible for the fraud. In the House.'of Lords, upon appeal, Lord St. Leonards said: “ I have come to the conclusion-, that, if-representations are made'by a company fraudulently,- for ’the purpose of enhancing the value of stock, and .¿bey. induce a third .person to purchase stock, those representations-.so made by theirf.bind the company. I consider representations .by the directors of a company as representations'by thé company, .although they may be representations made to the company. ”. •*. * * The report “ becomes' the act of the company by its adoption and sending it forth as a true representation of their affairs ; .and if that representation is. made usé of in -dealing with third persons, for the' benefit of the company, it subjects -them to-the loss which may accrue-to-the party who deals, trusting to those representations.”
 

 It would be difficult’ to furnish a reason for the liability of a corporation fora fraud, undér such circumstances, that would' not-apply to sustain an action for the publication- of a libel.
 

 The defendant's are a corporation, having a,large capital distribu ted- among-several hundred of persons. Their railroad connects' large "cities, and passes through'a fertile -district.Their business brings.them in competition with companies and individuals concerned in the' business of transportation. They have -a numerous body of officers, agents, and servants, for whose fidelity and skill they are responsible, and on whose care the~suecess of their business depends. The stock of the company is á vendible security,-and the community expects statements of its condition -and .management. There is no-doubt that it was the.-duty of the president and directors to
 
 *212
 
 investigate the conduct of their officers and agents, and to report the result' of that investigation to the stockholders, and that a publication of the evidence and report is within the scope of the powers of the corporation.
 

 But the publication must be made under all the conditions and responsibilities that attach to individuals under such circumstances. The Court of Queen’s Bench, in Whitefield
 
 v.
 
 South Eas. R. R. Co., (May, 1858,) say: “If we yield to the authorities which say that, in an action for defamation, malice must be alleged, notwithstanding authorities to the contrary, this allegation may be proved by showing that the publication of the libel took place by order of the defendants,- and was therefore wrongful, although the defendants had no ill will to the plaintiffs, and di'd not mean to injure them.” And the court' concluded: “ That for what is done by the authority of a corporation aggregate, that a corporation ought as such to be liable, as well as .the individuals who compose it.”
 

 The question arises, whether the publication is excused by ,the relations of the president and directors, as a committee from their board, to the corporation itself. It cannot be denied that the inquiries directed by those officers were within the scope of their power, and in the performance of a moral and legal duty, and that the communication to their constituents of the evidence collected by' them, and their conclusions upon the evidence, was a privileged communication in the absence of any malice or bad faith. But the privilege of the officers of the corporation as individuals, or of the corporate body, does not extend to the preservation of the report and evidence in the permanent form of a book for distribution among the persons belonging to the corporation, or the members of the community. It has never been decided that the proceedings of a public meeting, though it may have been convened by the authority of law, or of an association engaged in an enterprise of public utility, could" be reported in a newspaper as a privileged publication. • But a libel contained in such proceedings, if preserved in the form of a bound volume, might be.attended with more..mischief to private character than any publication in a newspaper of the same document.
 
 *213
 
 The opinion of the court is, that in so far as the corporate body authorized the publication in the form employed, they are responsible in damages. The .Circuit Court instructed the jury:
 

 1. If the jury find, from the evidence in this C^ise, that the defendants, by the president and directors of said company, published the letter from John T. Mahoney to S. M. Eelton, president, &c., dated March 3d, 1854, in the declaration men- • tioned, and that any or all of the statements in the said letter respecting the plaintiff in his trade' and occupation are false ; and shall further find, that the said president and directors, at the annual meeting of the stockholders of said company, held. 8th January, 1855, reported to the said stockholders their action in the premises, and that the proceedings of the committee of investigation (which contained the said letter) were then being printed, and, as soon as printed, would be distributed to the stockholders, and' that said report was accepted by the stockholders; and if the jury shall further find, that, after-the meeting of the stockholders had adjourned, the president and directors of said company distributed the book containing the said letter among the stockholders of this company, or any of them, then the jury may find for the plaintiff.
 

 • 2. And if the jury find for the plaintiff under the first instruction, they are nót restricted in giving damages to the ■ actual positive injury sustained by the plaintiff, but may give such exemplary damages, if any, as in their opinion are called for and justified, in view of all the circumstances in this casé, to render reparation to plaintiff, and act as an adequate punishment to the defendant.
 

 The first instruction is erroneous, because the publication to which the court referred as blameworthy, and to authorize the jury to find a verdict against the defendant, took place.after the commencement of this suit.
 

 The second instruction contains the same error, and is objectionable for the additional reason that the-rule of damages is not accurately stated to the jury..
 

 In Day
 
 v.
 
 Woodworth, 13 How. S. C. R., 371, this court recognised the power of a jury in certain actions of tort to assess
 
 *214
 
 against tbe tort-feasor punitive or exemplary damages. Whenever the injury complained of has been inflicted maliciously or wantonly, and with circumstances .of contumely o.r indignity, the jury are not limited to the ascertainment of á simple, compensation for the wrong committed against the aggrieved .person. But the malice spoken of in this rule is not merely the doing of an unlawful or injurious act. The word' implies, that the act complained of was conceived in the spirit of mischief, or of criminal indifference to civil obligations. ..Nothing, of this kind can be imputed to these defendants.
 

 The letter of Mahoney was reported to the company with other evidence that rendered it innocuous,- and its statements were never adopted by them. The-plaintiff has repeatedly affirmed that he had derived an advantage from the investigation by the company, and, upon reading all the evidence, as reported and published, we do not perceive how an impression unfavorable to him could have been made by it upon any candid mind. The circumstances under which the evidence was collected, and the publication made, repel the presumptioii of the existence of malice on the part of the-corporation, and so the j ury should have been instructed.
 

 The averments in the declaration of the facts proper to give the'Circuit Court jurisdiction over the parties, are'identical with those which were fully considered by this court, and received the sanction of two-thirds of the judges in Marshall
 
 v.
 
 The Baltimore and Ohio R. R. Co., 16 How., 314. A repetition of the discussion that took place and was. reported with that case is deemed to be unnecessary.
 

 The only plea filed in this cause is-the general issue, That plea raises an issue upon the merits of the complaint, and leaves the jurisdictional allegations without a traverse.
 

 No question involving the capacity of the parties in the cause to litigate in the Circuit Court can bé raised before the jury under such pleadings. Conard
 
 v.
 
 Atlantic Insurance Co., 1 Pet., 386; Evans
 
 v.
 
 Gee, 11 Pet., 80; Owings
 
 v.
 
 Wickliffe, 17 How., 47. The testimony that the States of Delaware and Pennsylvania had respectively granted a corporate character .to the same corporators that 'form- the corporation in Maryland,
 
 *215
 
 for tlie extension of the railroad through those States, to connect the cities that appear in the name of the corporation, and the testimony that some of the directors of the several corporations reside in Delaware, in the condition of the pleadings, was immaterial and irrelevant.
 

 For the errors we have noticed, the judgment of the Circuit Court is reversed, and the cause remanded.
 

 Mr. Justice DANIEL:
 

 In the judgment of this court, so far as it directs a reversal of that .of the Circuit Court, I fully concur. But, in my view, the decision has performed but half its proper office, by omitting to order a dismission of this case by the Circuit Court.
 

 It is not designed here to repeat' the arguments or the authorities so often and so unavailingly adduced,'in opposition to the cognizance of the Federal court of controversies in which corporations ai’e parties.
 

 Some cursory recapitulation will, however, be attempted of previous decisions made here, as evincing the progress of relaxation and inconsistency .from the first departure, from what, by. me at least, are deemed sound, legal, and constitutional principles, down to the remarkable instance exemplified in the ease before us.
 

 The first step in this progress was the decision that a corporation might be made á party in the Federal courts, by entirely destroying the existence of such a body; and by this process it was pretended that it was made capable of suing and being sued, and by imposing liabilities on private natural persons, who, by the very nature' and character of the corporate body, and by the terms of its organization, possessed not one of its powers, and could exercise not one of its functions. Vide 5 Cranch, 61; The Bank of the United States
 
 v.
 
 Deveaux. Next, and in order to cover this glaring irregularity, it seemed necessary to transform a corporation into a
 
 quasi,
 
 or into so much of a citizen as would authorize its pleading and being impleaded in the Federal courts, although the Constitution and the laws of the United States do not recognise nor make mention of any particular pai’t or fraction of a citizen,
 
 *216
 
 but confine the cognizance, of the courts to' controversies between
 
 citizens
 
 .of different States, sustaining.their full natural, political, and social relations. This was the object attempted inihe case of the Cincinnati Railroad Company and Letson, in the 2d of Howard. It then became necessary to give to this
 
 citizen corporation
 
 a local habitation or residence, in order to fix his origin and position, on which it was, and is yet, perhaps, conceded, that his admission into the courts of the United States was dependent; and this court, tó accomplish this purpose, seems to have settled upon one or the other of the following conclusions, or perhaps in part on both: that either the locality within which this
 
 citizen
 
 may be fabricated, or that within which his agents or factors (viz: the president and directors) hold their place of business, determines his political position, his capacities and responsibilities, although it is palpable this latter conclusion abrogates completely the previous, doctrine of this court, that the rights and powers of a corporation remain and inhere in the individuals interested in the company, and do not appertain regularly to the associated or organized body. From these anomalous- conclusions have arisen the curious formula in pleading, by which access has been sought and permitted in the courts of the United States— as for instance,
 
 a certain company, a body'
 
 corporate,'
 
 created by
 
 .
 
 some stated authority, but without averring citizenship or residence on the part of that body, but leaving'these to be'implied by the court,
 
 sues or is sued. In the case under' review, the party defendant below is averred to be the Philadelphia, Wilmington, and Baltimore Railroad Company, a body corporate
 
 in Maryland,
 
 incorporated by a law of Maryland. Here, then, is averred neither citizenship, nor an identity with, nor an equivalent for citizenship, nor residence, nor commorancy anywhere, on the part of the defendant. The corporate body is stated to be
 
 in Maryland,
 
 but whether in its organized constitution, or by the citizenship of its president and directors, or by its individual members, or whether in either character it is or is not
 
 of
 
 Maryland, is left to the court to supply; and this, too, in defiance of the unbroken chain of decisions from 3 Dallas, 382, down to 6 Wheaton, p. 450, comprising twelve distinct cases,
 
 *217
 
 ruling,
 
 in totidem verbis,
 
 that under the second section of the third article of the Constitution, riot only must the parties to suits in the Federal courts he citizens and inhabitants of different States, but that this character must be averred expressly, and must appear upon the record, and cannot be
 
 inferred from residence or locality,
 
 however unequivocally stated; and that the failure to make the required averrrient will be fatal to the jurisdiction of a Federal court, either original or appellate, and is not cured by the want of a plea of of a formal exception in ariy form, and that even the party who is guilty of the irregulai’ity may avail himself of it upon appeal.
 

 This case is marked by peculiarities, which, if they can, consistently with .the rules of pleading and evidence, be regularly-brought into view, will show more clearly than has hitherto been done the effects of the anomalous proceedings above adverted to. It is ruled by all the cases, that where want of jurisdiction in the Federal courts.is apparent on the face of the pleadings, the courts, original and appellate, are bound to take ■notice of this defect, and that there can be no requisition on parties to show it either by averment or.proof. The establishment of this principle certainly dispenses with the necessity for proofs in such a case, for why undertake to establish by proof that which is admitted? Moreover, the character of the defect partakes more, pérhaps, of matter of law than of fact. Hence it may be questionable, how far the introduction of any evidence, and still more of cumulative evidence, is or was admissible to show this admitted or patent defect, which’it has been so often ruled that the court must take notice of without plea or demurrer. But we-see by the record, that evidence, extensive and documentary, was introduced as to this poirit, and read without objection.. And to what conclusions does this evidence, if admissible, inevitably lead ? According to the decisions previously made here with respect to corporations— according, too, to the argument of counsel for the defendant in error — the Baltimore Railroad Company was created separately and exclusively by the State of Maryland, and its attributes of 6uing or being sued, and every other attribute or function, was imparted and perfected by that separate authority, which was
 
 *218
 
 limited by the power of Maryland. So, too, the Philadelphia Railroad Company was separately and independently created by Pennsylvania; and, in like manner and with like effect, the Delaware Railroad Company, by the State of Delaware. Neither of the States just mentioned had the power to create á citizen of another State, nor to create or invest any attribute or right of citizenship beyond its own'jurisdiction. It follows, . then, that, the incorporation of these companies was in each a-separate, independent, and distinct and complete act, operating only within .the. sphere of the legitimate .authority that performed it,- and any right or attribute of citizenship it could confer, would be imparted to its own subjects alone; it could not ’ ' determine the .polity- of other communities, or the rights of their people. But, by some professional magic, these three, separate creations, which, if invested with any of the qualities of citizenship, were- necessarily circumscribed as to these by ■the authority, of their respective States, are here converted into one. ' These three
 
 quasi
 
 citizens of different States are transformed-into one; and, although three-fold in. form, less than ’one; _and by this-transformation-are brought into tribunals where, real, citizens are not permitted to.litigate without averring, and if-denied, not without proving the truth and reality of their character in obedience to the command .of the Constitution. In the present instance, this may subserve the convenience of the individual," but in another aspect the mischiefs incident to such a relaxation would be apparent and serious. It would be putting it in the power of separate corporations, • deriving their origin from distinct sources by claiming a joint name or title, .to select at will, for its purposes, a forum within that jurisdiction, within which either corporate body was created. The averments of citizenship and residence being dispensed with by this court, no check is left to such a combination and irregularity;, and by this• practice there is extended, to artificial- bodies, which are not, and cannot, from thejnature of things,- be citizens, privileges which belong by the Constitution to citizens only,-and upon proof, if required, of the reality of their character as such. " ■ ' ■
 

 It has just been remarked that the arguments against the
 
 *219
 
 jurisdiction of the Federal courts over corporate bodies may be found in some of the opinions delivered in the case of Marshall against the Baltimore and Ohio Railroad Company, and it is said that these arguments it is unnecessary to repeat, and it is seen that they have not been deemed of sufficient cogency to prevent a concurrence in proceedings and pretensions which those arguments were urged to condemn.
 

 The relevancy or the justice of the above declaration I eqn- . fess myself somewhat at a loss to comprehend. If it be intended by way of recantation, prompted by a conviction of the 'unsoundness of those arguments, and as, a criticism upon those who are unable to chime in with the notes of such a palinodia, it would seem to me that a direct avowal of that conviction, and of the consequences *to which it had led, would have been nothing more than justice to all. If, on the other hand, the soundness of those arguments is still regarded as a regular deduction from constitutional principle,'and from fealty to the Constitution, then a relinquishment of those arguments, or the failure to assert them on every occasion similar to that first calling them-forth, however justifiable in the view of others, would in myself, by myself, be felt as a compromise of a sacred and solemn duty. The vindication of truth, wheneverwe shall be called on" to speak or to act, can never,, in my opinion, be properly shunned;
 
 I,
 
 therefore, ain bound to reassert'all which I have endeavored earnestly, however feebly, to maintain, and which I still believe.
 

 I am'further of the opinion, that apart ’from any question as to the peculiar jurisdiction of the Federal courts, this action could not be maintained in
 
 any forum
 
 possessing even general legal powers. It Is to be borne in mind, that the proceedings m this case are not founded upon any express or peculiar right or authority vested by statute or other special and competent power, but are claimed as the legitimate consequences inherent in, and flowing from, the nature and constitution of corporations aggregate. By those who affirm this doctrine it is indispensable that they should show as inherent in, and consistent with, the constitution of such corporations, the attributes and qualities to-which proceedings like the- present are calcu
 
 *220
 
 lated to apply, and with which they can, by any rational or logical comprehension, be made applicable. The metamorphosis which would transmute an aggregate corporation into a natural person, must necessarily transfuse into this new creation the capabilities and qualities of the being into which it is changed. Upon any other hypothesis, the fact of identity could not be. Natural persons are capable of the passions of love and hate; can contend in mortal combat by duel or otherwise ; can go into the field in command of armies; can sit upon the bench of justice, or in the legislative or executive departments of the Government. According to this transmutation theory, all these qualities are imparted to its new
 
 promethean
 
 experiment, who, of course, could he be only apprehended or laid hold of, might, like his prototype — or, more properly, his other self — be subjected for the misuse of those-qualities to the extremest penalties of the law, tlm scaffold or the gallows.. To my apprehension, this theory involves the confounding of all political, legal, moral and social distinctions. By that apprehension, derived from the definitions of corporations aggregate, as given by Brooke, Coke, and Blackstone, and by the express language of this tribunal in the earlier cases decided by it, these bodies are regarded as merely artificial — a species of
 
 fictiones juris,
 
 created for particular objects, and vested certainly with no greater or higher attributes than the creator of those bodies has power to bestow. Man can have no power to confer mind, passion, pr moral perception, nor moral powers, upon a mere fabrication of his own — a mere piece of parchment or paper. No
 
 quo animo,
 
 therefore, can be affirmed of a fiction to which np animus, or passion, or moral quality, can 'be imparted. .
 

 It has ever been admitted, that into slander or libel, malice essentially enters. Slander or libel is an injury inflicted with a wicked or malevolent motive. Reason and common sense would hence conclude, that where there could be motive of no kind whatsoever, there could be no malice, and therefore no offence, of which malice is the essential, the leading and distinguishing characteristic.
 

 In several of the English eases it has been ruled, that trover
 
 *221
 
 and trespass
 
 quart clausum fregii
 
 may be maintained against a corporation; and this, with respect to the latter action, is going a great way, as it-is not very easy to. explain in what mode a mere fiction or legal faculty can act
 
 vi et amis;
 
 yet a conceivable distinction may be taken between acts injurious in their effects and viewed as mere facts, and performed independently of or without motive, and for which the actor is bound to make reparation, and conduct the character of which lies exclusively in the motive, and which, apart from such motive, can neither exist nor be conceived.
 

 In conformity with these conclusions is the opinion of Alder-sen Baron, as late as the year 1854; (Vide 10 Exchequer Rep. 356; Stevens
 
 v.
 
 Midland Counties Railway Co.)
 

 But a precedent for the affirmation of such a legal, physical, and moral anomaly as an act to be characterized and appreciated by a quality which by no possibility can appertain to it, is relied upon in this case; and so far as that precedent is comprehended, it seems designed, at any rate, for an application like the one made of it in this cause. It is believed, however, to be a solitary precedent; and as the force of thát precedent (owing, perhaps, to no fault in his Lordship’s reasoning, but in those who are incapable of understanding his logic) is not very clearly apprehended; and as it most certainly contravenes the course of decision for centuries, the presumption of not yielding implicitly to the ruling of a Lord Chief Justice may perhaps be pardoned. This precedent is found in the case of Whitfield et al.
 
 v.
 
 The Southeastern Railway Company, just cited from the bench. That was an action for a
 
 libel,
 
 and the declaration was demurred to, for the reason that
 
 malice
 
 eoukl not be affirmed of a corporation aggregate.
 

 His Lordship says: “ The demurrer to the declaration in this case can only be maintained on the ground that the action will not lie without proof of
 
 express
 
 malice, as contradistinguished from
 
 legal
 
 malice.”
 

 How is this expression of.his Lordship to be understood? The averment of malice, and the application of that averment to the defendants, was a question arising upon the pleadings, and upon the character or capapity of the party complained of,
 
 *222
 
 as disclosed upon the face of the declaration. Whether malice, either
 
 express
 
 or
 
 implied,
 
 could be imputed to the plaintiff, could have no influence
 
 a priori;
 
 if
 
 malice
 
 was alleged, it opened at once-the only legitimate question ¿rising upon the demurrer, viz: could the defendants be guilty of malice? The character or the degree of malice was a question arising upon the proofs, .and was the proper subject for the instructions from the judge. It would be difficult to find a precedent in pleading, wherein a distinct avermeut as to
 
 express
 
 or
 
 implied
 
 or legal malice was made.
 

 His Lordship proceeds: “But if we yield to the authorities which say that in an action for defamation malice must be alleged, notwithstanding authorities to the contrary.” And here, with a willingness always to be instructed, I would gladly learn what authorities those are to which reference is thus made; for within the sphere of my own inquiries, going as far back as Owen, 51; Noy, 85; 1 Saunders, 242; 4 Bur., 2423; 3 Taunton, 246; and coming down to 8 Adolph, and Ell., 652; 1 Maule and Selwin, 639, it is held, without a dissentient, that the declaration must show a malicious intent íd defendant; and although the word
 
 maliciously
 
 is not absolutely necessarily requisite, yet words of equivalent import must be used; and it is said that the usual and better form of pleading
 
 is, falsely
 
 and
 
 maliciously.
 
 (Vide 1 Rep., 273.)
 

 His Lordship further proceeds, or is made to say: “ This allegation may be proved, by showing that the publication of thelibel took place by order of the defendants, and was therefore wrongful, although the defendants had no ill wilLto-the plain- " tiffs, and did not.mean to injure them. Therefore,
 
 (note the -, conclusion,)
 
 “The ground on which it is contended that an action for a libel cannot be maintained against a,corporation ; aggregate fails.” He who can connect this corollary with-the' premises surpasses any ingenuity of mine"!.
 

 To return to his Lordship’s argument:
 

 “ This allegation may be proved.” What allegation, we. ask? Why, the"
 
 libel,
 
 a
 
 malicious•
 
 publication, “by showing that' it took p ace by order of the defendants, although the defendants' had no ill will to the plaintiffs, and did not intend to injure them.” Thus it is said to be the law, that a libel may exist
 
 *223
 
 without an unfriendly intention; and with equal reason might it be alleged or imputed where the intention was amicable.
 

 I give the concluding reasons, ascribed to his Lordship for his decision. They are as follpws:
 

 “I may-mention, that corporations aggregate are now so common, that I believe that a public journal is conducted by a corporation aggregate limited. Therefore, it seems to us, that for what is done by the authority of a corporation aggregate," that a corporation aggregate ought, as such, to be liable as well
 
 perhaps
 
 as the individuals.
 
 Therefore,
 
 we think there-ought to be judgment for the plaintiffs.” .
 

 The connection between the number of aggregate corporations and their capacities .or liabilities, and the dependence in any degree of -the one upon the other; I leave to those who have been favored with greater perspicacity than has-been given to me.' I am wholly unable to perceive them.
 

 In 'fine, with due respect for others, and with becoming diffidence of myself; I ám constrained to say, of the opinion in the case of Whitfield v. The Southeastern Railway Company, as it has -been brought to the view of this court, that in its arguments and conclusions it is confused and obscure; and is • incongruous and contradictory, both in its reasoning and its conclusions. In the line of English adjudications it presents itself as solitary and-eccentric; and in opposition to the most inveterate, the clearest, and reiterated distinctions.announced by the sages of the law — distinctions having their foundation in reason and in the essential character of the subjects to which those distinctions have been applied. I cannot yield to that opinión my assent. I think, therefore, that for either of the objections before assigned there should be added to the reversal of the judgment of the Circuit Court an order for a dis-mission of the suit.