NEW YORK, L. E. & W. RY. CO. *v.* BENNETT *et ux.*

*(Circuit Court of Appeals, Sixth Circuit. June 6, 1892.)*

No. 11.

**1. CARRIERS OF PASSENGERS—SECOND-CLASS TICKETS—CONNECTING LINES.**
Where a second-class railway ticket provides that "no agent or employe has power to modify this contract in any particular," neither the ticket agent nor baggage master at a station where the holder is required to change cars has authority to instruct such passenger to take a limited express train, upon which only first-class tickets are accepted.

**2. SAME.**
As between the conductor of such a limited train and the passenger, the ticket is conclusive evidence as to the latter's right of transportation, and the conductor has no authority to accept it for passage on that train.

**3. SAME.**
One who has applied for and purchased a second-class ticket, and has used such tickets before, is bound by its terms, whether he has read them or not.

**4. SAME.**
The failure of a train carrying second-class passengers to connect with the proper train of another road, the two roads forming a through line, does not impose upon the second road an obligation to transport passengers holding second-class through tickets upon the next train,—a limited express,—upon which such tickets are not valid.

**5. SAME—EJECTMENT OF PASSENGER.**
A woman with two infant children, traveling on a second-class ticket, boarded a limited train, upon which first-class tickets only are valid. The conductor refused her ticket, and at the next important station she was put off. It was in the evening, and she remained at the depot for a time, till at her request she was sent to an hotel, and the next day money was collected with which she returned home, where she had an attack of nervous prostration. She testified, concerning the language of the conductor in refusing her ticket: "It was very rough; so much so that is what scared me most. If he had spoken pleasant to me, it would have been so much better. He spoke up in such a commanding way." She further said that at the depot the conductor said something about sending her to a hospital in a patrol wagon. *Held,* that the evidently imperative manner and form of speech of the conductor are not actionable in the absence of violence, or other willful misconduct, and a verdict for defendant should have been directed.

In Error to the Circuit Court of the United States for the Southern Division of the Eastern District of Tennessee.

Action by Mrs. Hattie A. Bennett and her husband, John R. Bennett, against the New York, Lake Erie & Western Railway Company for damages. Verdict and judgment for plaintiff. Defendant brings error. A motion to dismiss the writ of error was heretofore denied, (49 Fed. Rep. 598.) Judgment reversed.

Statement by SWAN, District Judge:

This is an action on the case commenced by attachment in the circuit court of Hamilton county, Tenn., for the ejection of Mrs. J. R. Bennett,

one of the defendants in error, from the passenger train of the railway company, *en route* from Cincinnati to New York. The action sounds in tort, and the declaration claims damages for the mortification incident to the plaintiff's removal from the train, and for an alleged false arrest and imprisonment of the female plaintiff at Dayton, Ohio, as part of the wrong and injury attending her expulsion. Upon the petition and bond of the plaintiff in error the case was removed to the circuit court of the United States for the southern division of the eastern district of Tennessee. It was there tried, and a verdict for $1,500 rendered for the plaintiff, upon which judgment was subsequently entered. From that judgment the defendant below took this writ of error, and the case is here for review on exceptions duly taken. Defendant pleaded "not guilty."

The material facts involved are in the main condensed from the testimony of the plaintiff Hattie A. Bennett, and her husband, who joins with her in the action. Mrs. Bennett desiring to go to Binghamton, N. Y., with her two infant children, her husband applied for and purchased for her from the agent of the Cincinnati Southern Railroad, in August, 1890, at Chattanooga, Tenn., a limited ticket to New York, paying therefor $20. The ticket was composed of three coupons,—one for passage to Cincinnati, one to Dayton, and the third thence to New York,—and on each coupon were printed the figures and letters "2nd," indicating the class of the ticket. This designation and notice was also printed in the body of the ticket, as one of the terms and limitations of the contract. The ticket, except the first coupon, is as follows:

"TICKET."

QUEEN AND CRESCENT ROUTE.

ONE PASSAGE

OF CLASS INDICATED TO POINT ON

N. Y., LAKE ERIE, & WESTERN R. R.

BETWEEN PUNCH MARKS.

On Coupons attached, when Officially Stamped, subject to the following **Contract.**

1st. In selling this Ticket and checking Baggage hereon, this Company acts only as Agent and is not responsible beyond its own line.

2nd. This Ticket is subject to the STOP–OVER regulations of the line over which it reads.

3rd. It is VOID for passage if any alterations or erasures are made hereon, or if more than one date is canceled.

4th. The UNPUNCHED FIGURE on the Coupons of this Ticket indicates its Class.

5th. This Ticket is good until used, unless limited by stamp or written indorsement or cancelled by punch in the margin of Contract.

6th. IF LIMITED as for time, this Ticket will be void after midnight of date cancelled by "L" punch in margin hereof and is subject to the exchange either in whole or in part at any point on the route for a continuous Passage Ticket or Check.

7th. When this Ticket is signed below by the purchaser, it is NOT TRANSFERABLE, and if presented by any other person than the original holder it will be taken up and full fare collected. The holder will write his (or her) signature when required to do so by Conductors or Agents.

8th. When this Ticket is not witnessed by Agent no signature is required by the purchaser.

9th. The Baggage liability of the Companies represented on this Ticket is limited to wearing apparel not exceeding $100 in value.

☞ No Agent or employe has power to modify this Contract in any particular.

D. G. EDWARDS, Gen. Pass. & Ticket Agent.

I hereby agree to all the conditions of the above contract,

Signature ..................................................................................................................................

Purchaser.

Witness ......................................................................................................................................

Agent.

---

ISSUED BY
QUEEN AND CRESCENT ROUTE,
N. Y. L. E. & W. R. R. (Via Salamanca) B C
DAYTON
TO POINT BETWEEN PUNCH MARKS.

LIMITED
L
PUNCHED.

| Pa | N Y | N Y | N Y | N Y | N Y | N Y | N J | O | | N Y | O | N Y | N Y | N J | | N Y | N Y |
| Bradford, | Binghamton, | Corning, | Elmira, | Hornellsville, | Middletown, | Newburgh, | Newark, | O | | New York, | O | Owego, | Port Jervis, | Paterson, | Susquehanna, | Wellsville, | Waverly, |
| | | | | | | | | O | | | O | | | | | | |

On Conditions named in Contract.

A 31    ONE PASSAGE.

NOT GOOD IF DETACHED.

Via Q&C, NYLE&W.

Unpunched figure indicates class of ticket.

Punched
L
2d.

---

ISSUED BY
QUEEN AND CRESCENT ROUTE,
N. Y. LAKE ERIE & WESTERN R. R.
CINCINNATI TO DAYTON.

Unpunched figure indicates class of ticket.

2d
punched
L

| Bradford | Binghamton | Corning | Elmira | Hornellsville | Middletown | Newburgh | Newark | O | | New York | O | Owego | Port Jervis | Paterson | Susquehanna | Wellsville | Waverly |
| | | | | | | | | O | | | O | | | | | | |
| | | | | | | | | O | | | O | | | | | | |

On Conditions named in Contract.

A 31    ONE PASSAGE.

NOT GOOD IF DETACHED.

Via Q&C, NYLE&W.

LIMITED
L
PUNCHED.

The evidence is that the price of a first-class ticket from Chattanooga to New York on the train she took was some six or eight dollars more, and that J. R. Bennett knew that fact, though he testified that the one purchased "was just as good to him as if he had paid $40 for it, and that he had traveled on the same ticket, [*i. e.*, of the same class,] and never had any trouble." Mrs. Bennett took the Cincinnati Southern train at Chattanooga, August 10, 1890, and reached Cincinnati at 7 A. M.,—two hours late for the connecting train,—and there waited until 6:25 P. M., when, as she testifies, a ticket agent told her the New York train left. She also says that she took her ticket to a baggage master, to see that her baggage was put on the train, and he told her she would take the 6:25 P. M. train to New York, which was a first-class train. She took that train, and gives this version of the occurrences for which she sues:

"When the conductor came for tickets, the first thing he said to me, he says: 'What are you on this train for?' I says: 'Why, what is the trouble?' He says: 'This is not your train. This train goes right through to New York.' I said: 'Did it? Well, what is the trouble?' He says: 'Your ticket does not call for this train. You must get off at Dayton, or I'll put you off.' 'Well,' I says, I don't see why I should be put off this train if the train is going through to New York.' I did not know of any trouble, and I told the conductor I would like to know what the trouble was. I did not like to be delayed any longer. I had been delayed through the day; had to wait in Cincinnati through the day. Well, he says: 'You get off. You must get off. If you don't I'll put you off. I ought to put you off down in the country.' He says: 'Why did you not show the ticket at the train?' I says: 'I did.' He says: 'You did not.' I says: 'I took it to the ticket agent, and I have proof of it.' He says: 'Well, give it to me.' And after examining the ticket he took off a portion of the ticket and then gave me this little white ticket. I had two small children with me, and of course hated to get off at Dayton. I can't remember just what took place there, the excitement was too much for me. He (the conductor) said he would take me off anyway, and then he says: 'We will see that you get on the next train all right,'—that was going out between eleven and one o'clock that night. Between one and two o'clock that night he came in with a policeman, and said: 'Your train is due, you must go and get your children on board.' Then I tried to have him know, and shook my head, that I could not, that I did not want to go any further. I was lying there, and I could not speak very well; I had such a bad spell; and I did not like to go any further. I felt very bad, and there was nobody to meet me when I got to New York, and just being in the condition I was, I was going there for my health. I thought if I got any worse, I had better go back home. Then he seemed to be out of patience, and says: 'I would like to know what you are going to do. You can't stay here in the depot. You have not got any money.' I motioned to him to hold down, so I could whisper, and I says: 'You telegraph to my husband. I know he will aid me.' He says: 'I know what I'll do. I'll send for the patrol wagon, and we will take you to the hospital.'"

She was subsequently assisted to an hotel near the depot, where she was properly cared for until noon of the next day, when she returned home, where she had a severe attack of nervous prostration. She was asked:

"*Question.* You say the only thing the conductor said about your ticket was that it did not call for that train? *Answer.* That is what he said. He said I had no business on that train."

On cross-examination she admitted that the day the policeman at the depot, finding she had not enough money to go back home, solicited the balance, and turned it over to her; that her baggage was checked at Central Depot at Chattanooga for the whole route; that before the train left Dayton the conductor told her that her ticket did not call for that train, and that the next train, for which it was valid, would arrive about midnight, but she preferred to wait until she felt better or go back home.

"*Question.* What wrong had been done to you up to that time? *Answer.* I could not tell you how much wrong. I was wronged through my feelings. I think I was very much wronged. [She does not know how she got to the ladies' waiting room, but supposes she was led there by the conductor.] *Q.* If there was anything else that was done to you I will be very much obliged if you will tell the jury what it was. *A.* I don't know of anything. *Q.* You have already stated what the conductor said to you when he came to take up your ticket, between Cincinnati and Dayton,—that he told you you ought not to be on that train. State whether,—what his manner was, whether it was rough and harsh, or it was kind and gentle. *A.* It was very rough. So much so that is what scared me most. If he had spoke pleasant to me it would have been so much better. He spoke up in such a commanding way."

She states that "no other insult or indignity was offered by any one else except the conductor." There is no evidence that plaintiff was arrested or imprisoned, or was subjected to any expense while at Dayton. The foregoing states all that is material of the plaintiff's testimony relevant to the conduct of the conductor and the circumstances of her expulsion at Dayton. The plaintiff was ejected from one of the cars of a first-class limited train, upon which, under the regulations of the company, only passengers having first-class tickets were allowed to ride. The testimony of the conductor, who is an employe of the Cincinnati, Hamilton & Dayton Railroad, does not vary essentially from that of the passenger, except that he denied all ungentlemanly conduct. The record shows that the plaintiff, with her children, were escorted by the conductor and station officer into a safe and comfortable waiting room in the railroad station at Dayton, which was well watched and lighted, where she remained without molestation, until, at her own request, she was assisted to an hotel, where she was provided with dinner gratuitously, while the officer on duty at the station went to the depot, and there collected enough money to pay her return fare to Chattanooga.

*Lewis Shepherd* and *Frank Spurlock*, for plaintiff.

*Thomas H. Cook*, for defendant.

Before JACKSON, Circuit Judge, and SAGE and SWAN, District Judges.

SWAN, District Judge, (*after stating the facts as above.*) Under the form of action adopted it was essential to recovery that the plaintiffs should establish either a breach of defendant's express contract, evidenced by

the ticket, for the carriage of plaintiff to New York, or by competent evidence, that defendant, by its agents, conductors, or servants, had violated the implied contract to protect its passengers against insult and violence, which the law attaches to the duties of a common carrier of passengers. It is not contended that the case made by the plaintiff meets the first of these requirements. Plaintiff, through her husband, had applied for and accepted a second-class ticket, which expressed, it is admitted, the contract between the company and herself for her transportation to New York. It was such a ticket as she had been accustomed to purchase for that route. Having accepted it, she was bound by its terms, whether or not she knew or read them. *Boylan* v. *Railroad Co.*, 132 U. S. 150, 10 Sup. Ct. Rep. 50; *Fonseca* v. *Steam-Ship Co.*, 153 Mass. 553, 27 N. E. Rep. 665. It provided among its printed conditions that "no agent or employe has power to modify this contract in any particular," and in its body, and upon the margin of each of its constituent coupons, notified the holder of its class and limitations. In the face of these notifications no assurance given plaintiff by the baggage master or the ticket agent at Cincinnati, of whom she claims to have made inquiries, could confer any right of transportation not expressed by the ticket itself, even had those officers been employes of defendant, which is not shown. *Boylan* v. *Railroad Co.*, *supra.* As between the conductor and the passenger, the ticket was conclusive evidence of the extent of the latter's right of transportation, and the conductor had no authority to give it any greater effect by permitting plaintiff to travel on that train. *Frederick* v. *Railroad Co.*, 37 Mich. 342; *Hufford* v. *Railway Co.*, 53 Mich. 118, 18 N. W. Rep. 580; *Mosher* v. *Railroad Co.*, 127 U. S. 390-396, 8 Sup. Ct. Rep. 1324; *Boylan* v. *Railroad Co.*, 132 U. S. 146-150, 10 Sup. Ct. Rep. 50.

The failure of the train on the Cincinnati Southern Railroad to make connection at Cincinnati with that upon which plaintiff was entitled to travel was not the fault of defendant, nor did it impose any obligation upon it to transport plaintiff on the train from which she was ejected. Her contract gave her no right of passage on that train, as plainly appears from its terms. No other is pleaded or proved. She was therefore wrong in her refusal to leave, and became thereby technically a trespasser, to whom the railroad company owed only proper care and civility until her removal could be lawfully effected. *Edwards* v. *Railroad Co.*, 81 Mich. 364, 45 N. W. Rep. 827, and cases cited. We are brought, therefore, to the examination of the incidents preliminary to and attending her removal from the train, which is the only remaining ground of action. The declaration avers that defendant's conductor was guilty of using "violent, abusive, and rough language towards plaintiff;" that he employed "force and violence" in ejecting her; and, in substance, charges that "defendant's several wrongs and outrages as aforesaid, [meaning thereby the conductor's language, and the violence used in plaintiff's ejection,] and * * * the wrongful, cruel, and inhuman treatment of plaintiff by defendant, its agents and servants," caused plaintiff's illness, and the permanent injury and disability for which,

*inter alia*, the suit is brought. There is no evidence that any violence was offered plaintiff, or any force employed, to effect her removal from the car to the waiting room at Dayton.

The learned judge who tried the cause declined to direct a verdict for defendant upon the whole evidence, and submitted to the jury the determination of the question whether the evidence made a proper case for punitive damages. His rulings on these points were seasonably excepted to, and error is assigned upon them. Without repeating the narrative of Mrs. Bennett, the substance of which, relative to the manner and incidents of her removal from the train, is given above, we are constrained to hold that these rulings were erroneous. To warrant the recovery of exemplary or punitive damages "there must have been some willful misconduct, or that entire want of care which would raise the presumption of a conscious indifference to consequences," (*Railroad Co.* v. *Ames*, 91 U. S. 495;) or, as it is put in *Philadelphia, etc.*, *Co.* v. *Quigley*, 21 How. 213, 214:

"Whenever the injury complained of has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity, the jury are not limited to ascertainment of a simple compensation for the wrong committed against the aggrieved person. But the malice spoken of in this rule is not merely the doing of an unlawful or injurious act. The word implies that the act complained of was conceived in the spirit of mischief or of criminal indifference to civil obligations."

The later cases are to the same effect. *Railroad Co.* v. *Humes*, 115 U. S. 521, 6 Sup. Ct. Rep. 110; *Barry* v. *Edmunds*, 116 U. S. 550–563, 6 Sup. Ct. Rep. 501; *Railroad Co.* v. *Harris*, 122 U. S. 597–609, 7 Sup. Ct. Rep. 1286. While it is for the jury, in a proper case, to determine the character of the wrong inflicted, and the measure of damages to be applied, the evidence must justify the court in submitting to them either or both inquiries as questions of fact. Plaintiff was on the train under an entire misconception of her contract relations to the carrier, and without right. Of that fact and its consequences she was fully informed by the conductor. If, in imparting that information, and the performance of the duty to his employer which plaintiff's refusal to leave the train, and her failure to pay the fare, devolved upon him, his language was opprobrious and insulting, or his conduct oppressive and contumelious, the corporation is undoubtedly responsible *civiliter* for the tort. The law, however, is not so unreasonable as to exact from the conductor of a passenger train, or the master of a steamship, upon whose vigilance and competency the lives and safety of passengers are dependent, a rigid observance of the formal amenities of social life, in the necessarily hurried discharge of his varied and important duties. It requires that he shall demean himself with civility, and shall protect passengers from insult and violence from others. Beyond this it has no standard of conduct, no code of manners. Of necessity, his communications with his passengers are in the main purely of a business nature. He has scant time for explanations; none for discussion or loquacity. The natural effect of his great and urgent responsibilities is to beget a characteristic brev-

ity and bluntness of manner and speech, varying in degree with the temperament and circumstances of the individual, often perhaps displeasing to the sensitive and inexperienced traveler, yet as far removed from legal censure as the demand of a lawful right in terse phrase. While his own and his employer's interest would be best served by a uniformly complaisant speech and demeanor, the mere lack of both is not insult; nor is his failure to gauge his address to the sensibilities, temperament, or latent ailments of his passengers an actionable dereliction. When called upon to declare the invalidity of a ticket, or to deny a passenger's claim to transportation, or to announce his duty to eject a person who refuses to pay fare, if he uses only the customary plain and positive diction of business, his employer cannot be mulcted in damages, or legally reprehended for his plain speaking or peremptory manner. *Rose* v. *Railroad Co.*, (N. C.) 11 S. E. Rep. 526.

Accepting plaintiff's own testimony as to what transpired between herself and the conductor, and laying out of view entirely the latter's version, there is no legal basis for the instruction which permitted the jury to award exemplary damages against the defendant. There was neither vituperation, epithet, contumely, nor aspersion in the language used by the conductor. It was a plain, matter of fact announcement that under the rules of the company, which left the officer no discretion, he could not accept the ticket she tendered for her transportation on that train, and she must leave the car at Dayton, or it would be his duty to remove her. Less than this he could not lawfully have done. More than this he did not do. There is even no complaint that this was said in a loud tone. True, she says of the conductor's manner: "It was very rough. So much so that is what scared me most. If he had spoken pleasant, it would have been so much better. He spoke in such a commanding way." The concluding phrase of this extract from her testimony at once defines the extent of her grievance, and is the severest criticism she makes upon the treatment of which she complains. The legal criterion of the conductor's address and conduct must be found in his language and manner, not in the plaintiff's opinion of their propriety, nor the epithets and adjectives by which she characterizes them. An imperative manner and form of speech is not actionable. Something more tangible than these is necessary to sustain an action of this nature, and, *a fortiori*, liability to exemplary damages. Plaintiff's was a mortifying experience, and its consequences are to be regretted, but they must be charged to her own negligence in taking the wrong train, and her refusal to comply with the lawful demand of the conductor, which necessitated and justified her ejection, the circumstances and place of which are not open to legal criticism. For the error pointed out in the instruction as to the liability of defendant to exemplary damages, and for the refusal of the court to direct a verdict for the defendant, the judgment must be reversed, and a new trial granted. It is unnecessary to decide the other questions presented by the bill of exceptions. Judgment reversed, with costs, and a *venire de novo* ordered.