DETERMINED IN THE

# COURT OF ERRORS AND APPEALS

OF THE

# STATE OF NEW JERSEY,

MARCH TERM, 1887.

---

ANTHONY J. KING AND ROBERT DUN DOUGLAS, PLAIN-
TIFFS IN ERROR, v. EMMA PATTERSON, DEFENDANT IN
ERROR.

1. In a legal sense, malice as an ingredient of an action of libel or slan-
der, signifies nothing more than a wrongful act done intentionally,
without just cause or excuse.
2. Where the publication imputes a crime so as to be actionable *per se*, or
is actionable only on averment and proof of special damages, if the
publication is not justified by proof of its truth or by the privileged oc-
casion of publication, the law conclusively presumes malice such as is
essential to the action.
3. The burden of proving that the occasion of publication was privileged
is on the defendant. The occasion being privileged, the burden is then
cast upon the plaintiff of showing that the words were published from
an improper motive, and not for a reason which otherwise would ren-
der them privileged.
4. The occasions which give rise to the privilege of speaking or publish-
ing defamatory words which otherwise would be actionable are vari-
ous. Whether the privilege is available as a defence depends upon
the circumstances of the particular case, the situation of the parties,
the persons to whom, the circumstances under which and the manner
in which the communication was made.

5. The subject in relation to which the communication was made may be privileged, and a communication on that subject be unprivileged. If the restraints and qualifications imposed by law upon the publicity to be given to such communications be disregarded, the communication is unprivileged and actionable. In such cases good faith and honest belief will be no defence.

6. A communication made *bona fide*, upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, although it contain criminatory matter which, without this privilege, would be actionable.

7. The business of a mercantile agency is a lawful business, but in its conduct and management it must be subjected to the ordinary rules of law and its proprietors and managers held to the liability which the law attaches to like acts of others.

8. A communication made by the proprietors of a mercantile agency in respect to the character and financial standing of a trader is privileged when made to those of its patrons who have a special interest in the information communicated. But this privilege does not extend to publications made to patrons who have no such interest in the subject matter.

9. The publication, by a mercantile agency, of a notification sheet, which is sent to its subscribers irrespective of their interest in the plaintiff's standing and credit, is not a privileged communication, and the proprietors are liable for a false report of the plaintiff's financial condition in such publication.

10. The damages recoverable in such an action are such as might reasonably have been foreseen as the probable consequences of the wrongful act, and which were the result, in the usual order of things, of such wrongful act.

On error to the Supreme Court.

The plaintiff below, Emma Patterson, was a trader engaged in the retail clothing business, at Red Bank, in this state. The defendants, King and Douglas, in connection with others, conduct a mercantile agency in New York city. Mrs. Patterson sued the defendants for the publication of defamatory words affecting her circumstances and financial condition. The defence was that the publication in question was a privileged communication.

The assignment of errors was upon the rulings and the charge of the trial judge.

King v. Patterson.

For the plaintiffs in error, *Philemon Woodruff* and *Thomas N. McCarter.*

*Contra, Flavel McGee* and *Wm. Pintard.*

The opinion of the court was delivered by

DEPUE, J. Defamatory words uttered in a privileged communication are not actionable unless there be proof of actual malice. If such words are uttered *bona fide* on a privileged occasion, in an honest belief that they are true, the party injured is remediless. *Spill* v. *Maule, L. R.,* 4 *Exch.* 232; *Clark* v. *Molyneux,* 3 *Q. B. Div.* 237. A wrong or malicious motive is essential to the action where the communication is privileged.

On the other hand, where the publication imputes a crime, so as to be actionable *per se,* or is actionable only on averment and proof of special damages, if the publication is not justified by proof of its truth or by the privileged occasion of publication, the law conclusively presumes malice such as is essential to the action. In such cases good faith and an honest belief in the truth of the publication will be no defence. The absence of a malicious motive may protect against exemplary damages, but will not bar the action. In a legal sense, malice, as an ingredient of actions for slander or libel, signifies nothing more than a wrongful act done intentionally, without just cause or excuse. *Cooley on Torts* 209, *and note.* A defamatory publication, under the pretext of a privileged communication, where the privilege does not exist, is a publication without just cause or excuse, and in a legal sense malicious and therefore actionable, though it be made without a malicious motive.

The burden of proving that the occasion of publication was privileged is on the defendant. The issue whether the words were published from a malicious motive, so as to take from them the protection of the occasion, arises only when it has been shown that the occasion of speaking or publishing is one that is privileged. Where the occasion is privileged it is for the plaintiff to establish that the statements complained of were

made from an indirect or improper motive, and not for a reason which would otherwise render them privileged.  *Clark* v. *Molyneux, supra ; Pollock on Torts* 227–234.

The fundamental question in this case, upon which the issue hinges, is whether the notification sheet of November 5th, 1884, containing the false statement on which the action is founded, was published and issued under such circumstances and in such a manner as to bring it within the class of communications which the law denominates privileged communications.

The occasions which give rise to the privilege of speaking or publishing words which otherwise would be defamatory and actionable are various.   Thus, memorials to officers of state respecting the conduct of magistrates and officers, comments by electors upon the character of candidates for office, communications in matters of public interest in which the public generally is concerned, communications in the interest of third persons or for the protection of the party's own interest, communications respecting the character of servants or the credit and responsibility of tradesmen, or made in the performance of social, moral or legal duties, come within the class of privileged communications.   Whether the privilege is available as a defence depends upon the circumstances of the particular case—the situation of the parties, the persons to whom, the circumstances under which, and the manner in which the communication was made.   A publication which in one case would be justifiable, in another case would be without justification.   A criticism of the public acts of a candidate for office may be inserted in a public newspaper or be proclaimed by a circular, but such publicity given to comments derogatory to the character of a servant or to the financial standing of a trader would be illegal.   A person, with a view of obtaining information on a subject in which he has a personal interest, or in offering a reward for bills of exchange lost out of his possession, may in some cases justifiably insert in a newspaper an advertisement containing imputations upon the character of others, as in *Delany* v. *Jones*, 4 *Esp.* 191, and *Finden* v. *West-*

King v. Patterson.

*lake,* 1 *Moody & M.* 461. He may justifiably advertise in that public manner the discharge of an agent whose employment had been that of a general collection agent, as in *Hatch* v. *Lane,* 105 *Mass.* 394, but such publicity to the discharge of his cook or his butler would be without justification. In some instances a voluntary imparting of information will be justified; in other cases the privilege applies only to information in response to inquiries. The subject may be one that is privileged, and a communication on that subject be unprivileged if the restraints and qualifications imposed by law upon the publicity to be given the communication be not observed. If such restraints and qualifications are disregarded, the communication is unprivileged and actionable, though made from the best of motives. In such cases good faith and honest belief will be no defence. The act of communicating defamatory matter to persons with respect to whom there is no privilege is an act without legal justification or excuse, and therefore actionable.

When the restraints and qualifications imposed by law upon the publicity to be given to the publication are shown to have been observed, it is then, as was said by the court in *Laughton* v. *Bishop of Sodor and Man, L. R.,* 4 *P. C.* 509, "all we have to examine is whether the defendant stated no more than he believed or might reasonably believe; if he stated no more than this he is not liable." Expressions of similar import are frequent in judicial opinions, but they have uniformly been preceded or accompanied by a judicial determination that the manner of publication was such as to make the communication privileged. No judicial precedent has ever treated good faith and honest belief, standing alone, as a justification of defamatory words.

The plaintiff was engaged in the retail clothing business, at Red Bank, in the county of Monmouth. The defendants conduct a mercantile agency in the city of New York. Their business consists in collecting information as to the credit and financial standing of dealers throughout the country. Four times a year they publish a book of ratings called the "refer-

ence book," and twice in each week a notification sheet called the "mercantile agency notification sheet." In the notification sheet of November 5th, 1884, there was published this information: "New Jersey. Red Bank. Patterson, Emma. Chattel mortgage, Samuel Ludlow, $1385. Clothing." The publication was false, and for the injury to the plaintiff's business occasioned by it this suit was brought.

The suit is an action by a trader for a false statement concerning her credit, and the defence that the publication was privileged must be decided upon those legal rules that give a privilege to communications of that character.

The trial judge charged that a communication made *bona fide* upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, although it may contain criminatory matter, which, without this privilege, would be slanderous or libelous and actionable.

This instruction was taken from the opinion of the Queen's Bench, in *Harrison* v. *Bush*, 5 *El. & B.* 344. It conforms to the rule adopted in *Whiteley* v. *Adams*, 15 *C. B.* (*N. S.*) 392, and in *Laughton* v. *Bishop of Sodor and Man*, L. R., 4 P. C. 495, in every respect material to this suit, and accords with the decision of the Court of Exchequer in *Toogood* v. *Spyring*, 1 *C., M. & R.* 181. In the latter case the defendant, a tenant of the Earl of Devon, required some work to be done on the premises occupied by him, and the plaintiff, who was generally employed by Brinsdon, the Earl's agent, as a journeyman, was sent by him to do the work. He did it, but in a negligent manner, and during the progress of the work became intoxicated, and some circumstances occurred which induced the plaintiff to believe that he had broken open the cellar door, and so obtained access to his cider. The court held that the communication of these facts to Brinsdon, the the agent of the earl, who, in virtue of his employment, had a duty to perform in the premises, was privileged, but that a communication at another time to one Taylor, a third person,

who had no interest in the subject matter, and no duty to perform in reference to it, was not privileged. The judgment of the court in Toogood *v.* Spyring, sanctions the rule adopted by the trial judge in this case.

The defendants were engaged of their own volition and for their own profit in the business of collecting and disseminating information as to the character, credit and pecuniary responsibility of traders throughout the United States. Their course of business was to transmit a copy of the record book and the semi-weekly notification sheet, containing the information they collected, to each of their subscribers, who paid the required annual subscription and signed a contract to hold such communications as confidential, without regard to the existence or non-existence of an interest by the subscribers in the information communicated. The number of subscribers to whom the record book and notification sheets were sent does not appear in the case. Mr. Dun, the principal proprietor, testified that it was impossible for him to say how many copies were issued, as there were a number of branch offices, and of the number of their subscribers he had no knowledge. Enough appeared to show that the defendants' business of collecting and disseminating information is extensive, and that the number of subscribers to whom such information is communicated is very large. It appeared that one Myers, a creditor of the plaintiff, saw the notification sheet of November 5th, 1884, in the hands of Lisberger & Weiss, merchants doing business in Philadelphia, and that Lyons, another creditor, saw another copy of it on the desk of Simons & Co., in New York city. In consequence of the information contained in this sheet, Myers and Lyons went to Red Bank and demanded payment or security for their debts. The plaintiff's credit was thereby destroyed, and her business was broken up. Myers and Lyons were not subscribers of the defendants. Lisberger & Weiss had, some two years before, sold goods to the plaintiff, but the account was closed at that time. It did not appear that Simon & Co. ever had dealings with the plaintiff. Neither of these persons had, at the time

the sheet was published, any business interest in the credit or financial standing of the plaintiff.

The trial judge applied the rule of law he adopted by an instruction in these words: "Had, then, Lisberger & Weiss an interest in knowing the financial condition and solvency of the plaintiff? Or had Simon & Co., in New York, such interest? Or had either party—the defendants, or Lisberger & Weiss, or Simon & Co.—a duty with reference to the condition of the business affairs as between themselves? If they had, then such communication, made *bona fide*, with the guard by contract and other stipulation between the parties appearing in evidence, would be privileged. If there was no such interest or duty between the defendants and these subscribers, then they may be liable, as the publication was not privileged as to them, or to others who obtained it through them. If a request was made, either express or implied, by Lisberger & Weiss, or by Simon & Co., for such communication as to the plaintiff, then, if they had no interest in the matter, the book or sheet sent to them, or either of them, affecting her credit, would not be privileged. If made without such request, then the communication voluntarily sent by them must be at their risk as to the harm that may be done thereby. I think it is enough to hold, in this case, that the agency has the protection of the privilege in every case where the subscriber has a direct and personal interest in the person who is the subject matter of inquiry, and that in all other cases they must stand as others, on the truthfulness of their report, and their protection under the contracts with subscribers not to divulge the secrets of their business."

In this discussion my citations will be limited to such cases as are regarded as leading cases, or are germain to the case before the court, with a view to distinguish or apply such decisions to the case in hand.

In *Capital and Counties Bank* v. *Henty & Sons, 7 App. Cas.* 741, the defendants, who were brewers, had printed a circular in these words: "Messrs. Henty & Sons hereby give notice that they will not receive in payment checks drawn on any of

the branches of the Capital and Counties Bank." This circular they sent by post to persons residing in various places in Sussex and neighboring counties, who were either tenants of or purchasers of beer from the defendants. The circular became known to other persons, and there was a run on the bank. The bank sued Henty & Sons for a libel, with an innuendo that the circular imputed insolvency. It appeared in the case that the practice of the defendants had been to collect from time to time, through their travelers, moneys due from their tenants and customers, and to accept payment by checks on local banks. Among the checks which, in the ordinary course of business, were likely to come into the hands of these persons, and which they might be likely from time to time to offer in payment to the defendants, some might be drawn upon the different branches of the plaintiffs' bank. The circular, as was said by Lord Selborne, related to the defendants' mode of conducting business between them and their tenants and customers, as to which it was proper that their debtors should be informed, and as the defendants were entitled to decide for themselves what checks they would accept or decline from their debtors, such a communication to their tenants and customers, if made *bona fide*, was privileged. The case, however, was decided in the House of Lords on the question whether the proof was sufficient to sustain the innuendo that the circular imputed insolvency. The court held that the words of the circular, in their natural meaning, were not libelous ; that the inference suggested by the innuendo was not the inference which reasonable persons would draw, and that the circumstances attending the publication did not show that the circular had a libelous tendency. Speaking of the fact that some of the persons who received the circular did in fact show it to strangers, Lord Selborne said : " I do not think that any such communication by them to strangers, unauthorized by the defendants themselves, could properly be evidence in support of the innuendo." He added : " If it had been publicly placarded by the defendants, on the walls of Chichester or other towns, or had been advertised by them in newspapers, or sent

by them through the post to persons with whom they had no business relations, this might have been evidence of a malicious intention, beyond what was expressed by the mere words of the document."

The case cited is distinguished from that in hand in the circumstance that the circular in that case did not bear on its face a construction imputing insolvency, and was sent only to persons having an interest in the subject; whereas in this case the statement in the notification sheet plainly affected the plaintiff's financial standing, and was sent to all subscribers promiscuously, without regard to their interest in that subject.

In *Lawless* v. *Anglo-Egyptian Oil Co.*, L. R., 4 Q. B. 262, an action for libel was brought against a corporation for publishing a report made to the company by auditors in their audit of the managers' account, reflecting upon the plaintiff. The report was submitted at a general meeting of the shareholders of the company, and under a resolution of the meeting was printed and circulated among the shareholders. The court held that inasmuch as it was the interest of all the shareholders to be informed of the report, the printing and such publication of it were privileged on the ground, as was said by Mellor, J., "that to print the report was a necessary and reasonable mode of communicating it to all the shareholders, who must be more or less numerous." It will be observed that the *gravamen* of the action was the publication to the shareholders, persons immediately interested in the report, and that no other publicity had been given to the defamatory matter except to the printer by whom it had been printed. In *P., W. & B. R. R. Co.* v. *Quigley*, 21 *How.* 202, a report made to stockholders in writing, and printed, with respect to the capacity and skill of one of the company's employees, the superintendent of the company's railroad, was held to be a privileged communication; but it was also held that the privilege did not extend to the preservation of the report in a book for distribution among the persons belonging to the corporation or the members of the community.

These cases are simply illustrations of the principle that a

communication made upon a subject matter in which the party communicating has a duty is privileged when made to persons having a corresponding interest in it, and they illustrate how carefully the privilege is restricted within the bounds reasonably necessary to effect the communication to the parties actually interested. So strictly is this limitation within reasonable bounds enforced, that in *Williamson* v. *Freer, L. R.*, 9 *C. P.* 393, the transmission unnecessarily, by a post-office telegram, of libelous matter which would have been privileged if sent in a sealed letter, was held to avoid the privilege, although the post-office clerks through whose hands it would pass were prohibited, under severe penalties, from disclosing telegrams passing through their hands, the principle of the decision being that publication was thus made to persons in respect of whom there was not any privilege. *Pollock on Torts* 234.

The defendants' dissemination of the notification sheets among their subscribers as a class, being intentional and in the regular course of their business as it was conducted, it is not necessary to consider whether *Tompson* v. *Dashwood*, 11 *Q. B. Div.* 43, in which it was held that a communication intended to be made on a privileged occasion was privileged where, by the sender's negligence in putting letters in wrong envelopes, the communication was sent to a stranger to the occasion, was correctly decided. It will be observed that in Tompson *v.* Dashwood the misdirected letter was sent to the plaintiff's brother, and in fact caused no special injury to the plaintiff. It may also be remarked that Mr. Pollock, in his recent Treatise on Torts, disapproves of this case as a decision by no means universally accepted by the profession as good law, and as contrary to the earlier decisions. *Pollock on Torts* 216, 234. A defendant intends to send a communication derogatory to the plaintiff's character or circumstances to A, where it would do no harm. By inadvertence he sends it to B, which produces the injury complained of. It is obvious that it would be a plain transgression of legal principle to excuse the act he did because he intended to do an act from

which no injury to the plaintiff would have resulted, and thus visit upon an innocent sufferer the consequences of the heedless act of the wrong-doer which occasioned the injury.

I turn now to the judicial precedents directly in point.

In Beardsley *v.* Tappen the defendant conducted a mercantile agency for furnishing information to subscribers, under rules and regulations for maintaining the personal and confidential character of communications to subscribers similar to those in the defendants' contract with their subscribers. The plaintiff sued in an action for libel, for communicating false information with respect to the plaintiff's financial condition. The words in question had been entered in the defendant's record book by his clerks and had been read by them to clerks of subscribers sent by their employers to make inquiries. The trial judge instructed the jury that no person other than the merchant himself, asking for information, had in law a right to read or hear said words, and that the reading of said words by any person in defendant's employ, with his permission, or the reading of said words by defendant himself, or by any person in his employ, to the clerk of a merchant subscriber requesting information concerning the plaintiff, was an unlawful publication, not at all within or protected by the rule of law as to privileged communications. The plaintiff having obtained a verdict, Mr. Justice Nelson, in denying a motion for a new trial on the ground of misdirection, held that the principle upon which privileged communications rest imported confidence and secrecy between individuals, and was inconsistent with the idea of a communication made by a society or congregation of persons, or by a private company or a corporate body. The facts and the charge of the trial judge are reported in 1 *Am. Lead. Cas.* 205, and the opinion of Mr. Justice Nelson in 5 *Blatchf. C. C.* 497. The judgment was reversed in the Supreme Court of the United States, no opinion having been expressed on this subject.

The charge of the trial judge and the reasoning of Mr. Justice Nelson place unreasonable restrictions upon the doctrine of privileged communications. Agents to collect information,

clerks to record it and to communicate it to subscribers, on the one hand, and confidential clerks to receive the information in the interest and by the authority of subscribers, on the other hand, are absolutely necessary to the usefulness, if not the existence, of these institutions. The employment of clerks who obtain thereby such information as their duties. necessitate—like the intervention of the printer where printing a report is, in the judgment of the court, a reasonable method of communicating to a large body of interested persons, as the shareholders of a corporation—does not take from the transaction its character as a privileged communication.

Other cases have placed the subject on more reasonable grounds. In *Ormsby* v. *Douglass*, 37 *N. Y.* 477, the defendant kept a mercantile agency, to obtain information respecting the credit and responsibility of persons in trade, and furnish the same to subscribers. A subscriber who held a note against the plaintiff personally applied at the defendant's office for information concerning the plaintiff. The record books were examined by the defendant's clerks, and the information was given. The statement complained of was made orally to one interested in the information, upon personal application at the defendant's office. The Court of Appeals of New York held the communication to be privileged. On the other hand, the same court held that a communication made by a person engaged in the business of a mercantile agent, to subscribers, which was not confined to such of them as made inquiries of him, but was printed by his procurement and distributed by him to subscribers who had no special interest in being informed of the condition of the plaintiff's firm, was not privileged. *Taylor* v. *Church*, 4 *Seld.* 452.

The question was again considered in that state, by the new Court of Appeals, in *Sunderlin et al.* v. *Bradstreet*, 46 *N. Y.* 188. The suit was against the proprietors of a mercantile agency. The defendants published a semi-annual volume containing the names of persons and firms doing business in various parts of the United States and Canada, and information in reference to their financial condition, and also a weekly

sheet of corrections, which was sent to their subscribers in the city of New York and in the country, by mail. In this weekly sheet they published that the plaintiffs had failed. The publication was false. The question was whether the publication was a privileged communication. Mr. Justice Allen, in the opinion of the court, said: "A communication is privileged within the rule when made, in good faith, in answer to one having an interest in the information sought; and it will be privileged if volunteered, when the party to whom the communication is made has an interest in it, and the party by whom it is made stands in such relation to him as to make it a reasonable duty, or at least proper, that he should give the information. * * * In the case at bar it is not pretended that but few, if any, of the persons to whom the ten thousand copies of the libelous publication were transmitted had any interest in the character or pecuniary responsibility of the plaintiffs, and to those who had no such interest there was no just occasion or propriety in communicating the information. The defendants, in making the communication, assumed the legal responsibility which rests upon all who, without cause, publish defamatory matter of others; that is, of proving the truth of the publication, or responding in damages to the injured party. The communication of the libel to those not interested in the information was officious and unauthorized, and therefore not protected, although made in the belief of its truth, if it were, in point of fact, false. * * * In those cases in which the publication has been held privileged the courts have held that there was a reasonable occasion or exigency which for the common convenience and welfare of society, fairly warranted the communication as made. But neither the welfare nor convenience of society will be promoted by bringing a publication of matters, false in fact, injuriously affecting the credit and standing of merchants and traders, broadcast through the land, within the protection of privileged communications." The court held that information communicated, not merely to persons inter-

ested in it, but published to all persons who might be subscribers to the scheme of publication, was not privileged.

The decisions in the federal Circuit Courts are in coincidence with those of the courts of New York. *Erber* v. *Dun,* 12 *Fed. Rep.* 526; *Trussell* v. *Scarlett,* 18 *Id.* 214; *Locke* v. *Bradstreet Co.,* 22 *Id.* 771. Against these authorities I find neither judicial decision nor *dictum.*

I concur in the result reached in Sunderlin *v.* Bradstreet, and in the reasoning upon which the judgment was founded. The defendants can claim no additional privilege in virtue of the business in which they are engaged. Their business is a lawful business, but, as was said by the court in Sunderlin *v.* Bradstreet, " in its conduct and management it must be subjected to the ordinary rules of law, and its proprietors and managers held to the liability which the law attaches to like acts by others." The publication of defamatory matter affecting third persons, in a business prosecuted for personal gain, can be tolerated only on grounds of public convenience. The rights of individuals ought not to be made to yield to the exigencies of such a business more than public interests require. Public interests will be adequately conserved by extending the immunity of privileged communications only so far as to embrace communications to subscribers who have a special interest in the information. This restriction lays no unreasonable restraint upon the business of these agencies in collecting and communicating information in the interest of the public. Society is organized and courts are established for the protection of the rights of individuals. Unrestrained by those legal principles which control the acts and conduct of other persons under like circumstances, these agencies, in the vastness of their operations, are capable of becoming instruments of injustice and oppression so grievous that public policy would require their entire suppression.

Nor can the defendants acquire a larger measure of immunity by reason of their contracts with their customers to hold the information as confidential. The contract of the defendants with their subscribers is *inter sese.* In fact it affords no

protection against injury by false reports.   The manner in
which these reports are disseminated renders protection to the
public under the terms of the subscribers' contracts a delu-
sion.   Each of the subscribers has a printed copy to retain in
his possession.   Myers testified that although not one of the
defendants' subscribers, he nevertheless had seen their reports
twice a week right along—sometimes only once a week and
sometime twice a week ; that during the last ten years he had
seen their notification sheets thousands of times, and that any
reputable merchant could get hold of their sheets, whether he
is a subscriber or not.   Others of the plaintiff's creditors who
were not defendants' subscribers testified that they had fre-
quently seen the defendants' notification sheets, and some that
they had seen the sheet of November 5th, 1884.   The injury
to the plaintiff from the false report resulted from the manner
in which the defendants disseminated their publications.   It
has been held that damage occasioned by the unauthorized
repetition by a third person of defamatory words uttered
orally is too remote to support an action against the original
utterer of them, where the words are actionable only by reason
of special damage.   *Ward* v. *Weeks*, 7 *Bing.* 211.   This case
and the cognate case of Vicars *v.* Willcocks have been criti-
cised.   2 *Smith's Lead. Cas.* (*8th ed.*) 552.   The principle
held in that case, if sound, has never been applied to written
or printed libels, nor is it applicable to defamatory matter
published in that manner.   The correct principle to apply to
such publications is that the original publisher is answerable
in law for all the consequences of his wrongful act which were
reasonably to be foreseen, and which were the result, in the
usual order of things, of such wrongful act.   *Hughes* v. *Mc-
Donough*, 14 *Vroom* 460 ; *Pollock on Torts* 463.

The rule adopted by the learned judge, in defining the
qualifications and limitations upon publications affecting
credit and financial standing, which would make such publi-
cations privileged communications, was correct.   His appli-
cation of the rule to the facts of this case was as favorable to
the defendants as they were entitled to have.   His ruling with

respect to the liability of the defendants for damages resulting from their wrongful acts was also correct.

The other exceptions have been examined. It is sufficient to say we find in them no error which would justify a reversal.

The judgment should be affirmed.

VAN SYCKEL, J. (dissenting). The alleged libelous publication was a printed communication published by a commercial agency in the city of New York, of which the defendants below were members. The publication was contained in what is known as a "notification sheet," by which the agency communicated to its subscribers information affecting the financial standing of merchants and traders in various parts of the country. The plaintiffs below complained that in one of such notification sheets it was falsely stated that she had put a chattel mortgage on her stock of merchandise.

The case shows that every subscriber to the commercial agency was required to enter into and did enter into a written agreement with the agency that all communications made by the agency, either verbally or through notification sheets, should be strictly confidential, and should be exclusively confined to the business of such subscribers' establishments. The information furnished is declared in this contract to be furnished to subscribers on request, for use in their business, as an aid to them in determining the propriety of giving credit.

The trial court ruled that the agency had the protection of privilege in every case where the subscriber had a direct and personal interest in the person who is the subject matter of inquiry, and that in all other cases they must stand, as others, on the truthfulness of their report and their protection under the contracts with subscribers not to divulge the secrets of their business.

Malice, express or implied, is absolutely essential to support an action for defamation. If a man writes and publishes of another that which is false and defamatory, the law will usually imply malice on his part without any evidence of express malice. But there are many occasions on which one may pub-

lish of another that which proves to be untrue, when the legal implication of malice will not arise. In such cases the publication is not actionable unless express malice can be shown. This leads to the consideration of the much discussed doctrine of privilege.

The term "privileged," as applied to a communication alleged to be libelous, means simply that the circumstances under which it was made are such as to repel the legal inference of malice, and to throw upon the plaintiff the burden of offering some evidence of its existence beyond the mere falsity of the charge. *Mr. Justice Selden, in Lewis* v. *Chapman,* 16 *N. Y.* 369.

Baron Parke, in *Wright* v. *Woodgate,* 2 *C., M. & R.* 573, has clearly defined the term. He says : " The proper meaning of a privileged communication is only this : that the occasion on which the communication was made rebuts the inference *prima facie* arising from a statement prejudicial to the character of the plaintiff, and puts it upon him to prove there was malice in fact—that the defendant was actuated by motives of personal spite or ill will, independent of the occasion on which the communication was made."

This rule is founded in public policy, and has been liberally applied.

In *Waller* v. *Lock,* 45 *L. T.* (*N. S.*) 243, Jessel, Master of the Rolls, says : " If an answer is given in the discharge of a social or moral duty, or if the person who gives it thinks it to be so, that is enough ; it need not even be an answer to an inquiry, but the communication may be a voluntary one."

He further observes, in the same case : " It appears to me that if you ask a question of a person whom you believe to have the means of knowledge, about the character of another with whom you wish to have any dealings whatever, and he answers *bona fide*, this is a privileged communication."

In *Toogood* v. *Spyring,* 1 *C., M. & R.* 181, 184, Baron Parke says : " If such publications   *   *   *   be fairly made, by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters

where his interest is concerned, in such cases the occasion prevents the inference of malice which the law draws from unauthorized communications.  *   *   *   If fairly warranted by any reasonable occasion or exigency, and honestly made, such communications are protected for the common convenience and welfare of society ; and the law has not restricted the right to make them within any narrow limits."

To the like effect is the expression of Lord Ellenborough, in *Delany* v. *Jones*, 1 *Esp.* 193 : " Though that which is spoken or written may be injurious to the character of the party, yet if done *bona fide,* as with a view of investigating a fact in which the party making it is interested, ·it is not libelous."

In *Laughton* v. *The Bishop, L. R.*, 4 *P. C.* 504, the House of Lords ruled that "a communication made *bona fide* upon any subject matter, in which the party communicating has an interest, or in reference to which he has or believes he has a duty, is privileged, if made to a person having a corresponding interest or duty, although it contains criminatory matter which, without that privilege, would be defamatory and actionable."

Mr. Justice Selden, in *Lewis* v. *Herrick, supra,* states the doctrine even more broadly : " Where the circumstances show that the defendant may reasonably be supposed to have had a just and worthy motive for making the charge, then the law ceases to infer malice from the mere falsity of the charge, and requires from the plaintiff other proof of its existence."

*Weatherstone* v. *Hawkins*, 1 *T. R.* 1105, was an action by a discharged servant against his former master for words spoken by him to one Rogers, who applied for information about the servant's character.   There was a count, also, for libelous words contained in a letter written by defendant to one Collier after Rogers had declined to employ plaintiff. This letter accused plaintiff of embezzlement.   This letter was not written in reply to a request by Collier for information, nor under an injunction of secrecy ; its sole purpose seems to have been to vindicate the defendant for uttering the previous

defamatory words to Rogers, and thus to prevent a suit by plaintiff. Lord Mansfield, in deciding the case, said : " I have held, more than once, that an action will not lie by a servant against his former master for words spoken by him in giving the character of a servant. The general rules are laid down as Mr. Wood has stated, but to every libel there may be a necessary and implied justification from the occasion, so that what, taken abstractedly, would be a publication, may, from the occasion, prove to be none—as, if it were read in a judicial proceeding. Words may also be justified on account of the subject matter or other circumstances. In this case, instead of plaintiff's showing it to be false and malicious, it appears to be incidental to the application by Rogers to the master of the servant. And the letter was written to the brother-in-law of the plaintiff for the express purpose of preventing an action being brought."

*Hewer* v. *Dawson, Buller N. P.* 8, was an action for saying of the plaintiff, who was a tradesman, " he cannot stand it long ; he will be a bankrupt soon." Special damage was laid in the declaration that one Lane had refused to trust the plaintiff for a horse. Lane, the person named in the declaration, was the only witness called for the plaintiff. It appeared in his testimony that the words were not spoken maliciously, but in confidence and friendship to Lane, and by way of warning him, and that in consequence of that advice he did not trust the plaintiff with the horse. Chief Justice Pratt said that " though the words were otherwise actionable, yet, if they should be of opinion that the words were not spoken in malice, but in the manner before mentioned, they ought to find the defendant not guilty."

It did not appear that the defendant was applied to for the information or that he had any interest in the transaction other than a friendly disposition to warn Lane of the risk.

*McDougall* v. *Claridge*, 1 *Campb.* 267, was for a libel on the plaintiff in his profession as a solicitor. The libel was a letter written by defendant to bankers at Nottingham, charging the plaintiff with improper conduct in the management

of their affairs. It appeared, however, that the letter was intended as a confidential communication, and that the defendant was himself interested in the affairs which he supposed had been misconducted. Lord Ellenborough held that the action would not lie; that it was impossible to say that the defendant had maliciously published a libel to aggrieve the plaintiff, if he was acting *bona fide*, with a view to the interests of himself and of the persons whom he addressed.

In the case of *Toogood* v. *Spyring*, *supra*, Baron Parke decided that if a former master, when applied to, gives the character of a discharged servant in the presence of a third person not interested, the communication, if made *bona fide*, is privileged.

In the subsequent case of *Kine* v. *Sewell*, 3 *M. & W.* 302, he expressed his conviction that the law had been properly laid down in the previous case.

*Lawless* v. *Anglo-Egyptian Cotton Company*, L. R., 4 Q. B. 262, was an action against a joint stock company, the directors of which had published in the form of a printed circular, issued and sent to all the stockholders, the report of an auditing committee appointed to make an investigation into the finances of the company. The report contained defamatory statements concerning the plaintiff, who had been manager of the association. It was held that under these circumstances the presumption of malice did not arise, and the plaintiff was therefore non-suited.

The following cases show that in the authorities heretofore cited the rule has been correctly enunciated: *Bank* v. *Henty*, L. R., 7 App. Cas. 741; *Thompson* v. *Dashwood*, L. R., 11 Q. B. 43; *Tuson* v. *Evans*, 12 Ad. & El. 733; *Phila., W. & B. R.* v. *Quigley*, 21 How. 202; *Finden* v. *Westlake*, 1 M. & M. 461; *Hatch* v. *Lane*, 105 Mass. 394; *Brow* v. *Hathaway*, 13 Allen 239; *Somerville* v. *Hawkins*, 10 C. B. 580.

These cases show that all that is necessary to entitle such communications to the claim of privilege is that the relation of the parties should be such as to afford a reasonable ground for supposing an innocent motive for giving the information

and to deprive the act of the appearance of an officious inter-
meddling with the affairs of others. *Van Wyck* v. *Aspinwall*,
17 *N. Y.* 190; *Klinck* v. *Colby,* 46 *N. Y.* 427.

The cases heretofore cited have been considered without
reference to mercantile agency cases.

The trial judge adopted the rule laid down in *Sunderlin* v.
*Bradstreet,* 46 *N. Y.* 188, and in *Erber* v. *Dun,* 12 *Fed.
Rep.* 526, both of which are commercial agency cases.

In other cases of this character a different view has been
held.

In *Trussell* v. *Scarlett,* 18 *Fed. Rep.* 214, Judge Morris
ruled that a notification sheet of R. G. Dun & Co., sent to a
subscriber, containing a charge of bankruptcy against plain-
tiff, was a privileged communication.   To this case Dr. Whar-
ton has appended a note maintaining the view that if the
agency confines itself to the confidential communication of
such information to its customers, then, if it acts *bona fide,*
and without malice or recklessness, these communications are
privileged, and the defendant, if sued for libel, would be
entitled to a verdict.

The same opinion was entertained by Judge Nelson in
*Locke* v. *Bradstreet,* 22 *Fed. Rep.* 771 ; by Judge Dewey in
*Billings* v. *Russell,* 8 *Boston Law Rep.* (*N. S.*) 699, and by
the Wisconsin court in *State* v. *Lonsdale,* 48 *Wis.* 848.

The underlying principle of the many cases cited, in my
judgment, condemns *Sunderlin* v. *Bradstreet,* and *Erber* v.
*Dun,* and extends the rule of privilege to all communica-
tions, spoken or written, *bona fide,* in the performance of what
may reasonably be considered a duty to the public or to an
individual, and also to communications required by a common
interest, or by the relation in which the persons, between
whom the communication is made, stand to each other.   A
false, defamatory publication must, when no other adequate
motive appears, be attributed to malice ; but whenever the
attending circumstances are such as to lead a reasonable and
just mind to reject the presumption of actual malice, an

King v. Patterson.

essential requisite to the support of the action for libel disappears.

It is this consideration of what justly may and what may reasonably be presumed to actuate the conduct of men, that has led the judicial mind to introduce and apply the doctrine of privilege.   The conceded instances in which this protection is accorded are not rare.   Words spoken by a member in a legislative assembly ; by one upon the subject matter before a religious meeting ; by counsel in the conduct of a cause ; by one in response to inquiries by a friend concerning a physician, a lawyer, or a tradesman, and by a former master to one who desires to know the character of a servant.   Words thus spoken are not actionable *per se ;* the presumption of malice is excluded, because it is not reasonable to suppose that it is present.   No case has been cited, and I think none exists, where the plaintiff has been permitted to make an issue of the fact, whether the person applying to a former master in regard to the character of a servant, had in truth an interest in knowing.   It has been deemed sufficient to put the case within the rule of privilege, that application was made and the answer given *bona fide.*   Nor has any consideration been given to the magnitude of the interest which elicted the inquiry, or whether the interest was present or prospective.   Nor, in the case of master and servant, has the master ever been held to any accountability for failing to use reasonable care to inform himself that the inquiry was made in good faith.

Where inquiry is made of the master by one person at the solicitation of another, and where a tradesman inquires as to the responsibility of persons he may hope will sometime offer to deal with him, although he has no direct present interest in them, communications in reply seem to be clearly within the principle of the protecting rule.

It is now almost universally conceded that mercantile agencies are of great utility and advantage, if not absolutely essential, to those engaged in conducting the business and commerce of the country over the wide field where their enterprise leads them.   The strict rule applied in the court below, if it

does not tend to suppress, will go far to destroy the purpose and utility of these institutions.

It may be said that in New York the rule in *Sunderlin* v. *Bradstreet* has been productive of no such result. But there the pledge of secrecy has hitherto served the agencies from a disastrous flood of civil suits and criminal prosecutions, which they could not have survived. Experience there furnishes proof, not of the wisdom of the rule, but that it is wise not to enforce it. There is no consideration of public policy which commends the application to them of an illiberal rule.

If immunity is accorded to the master making statements concerning his servant, when in fact the inquiry is made by one who does not intend to employ the servant, and if malice is not presumed to exist where a merchant makes inquiry of his neighbor or friend concerning the pecuniary responsibility of those with whom he may in the future have transactions, how can the doctrine of privilege be restricted, in this controversy, to cases where the subscriber has a present direct and personal interest in the person who is the subject of inquiry?

Business interests are so ramified at this day that large enterprises cannot be successfully conducted without a comprehensive survey of the whole field of industry. The manufacturer must have some knowledge of the financial condition of those who are his rivals in business, as well as of those who may be induced to purchase his productions, in order that he may act judiciously in fixing his limit of production. The dealer in brewers' grains, in order to determine the extent of his purchases, must know something of the business of the consumers, their pecuniary ability to purchase, and the probable volume of business in the district of country over which his transactions extend. In fact, every man who has merchandise to sell is to some extent interested in knowing how every man in the country stands in credit.

Though one is not a customer to-day, he may be to-morrow. Orders are given by letter, by telegram, by telephone, or in person, requiring immediate response. It involves the use of

the mercantile agency sheets, the loss of the customer, or the risk of selling blindly.

The subscribers to the commercial agency in effect say to it: " We have an interest in knowing the financial condition of all business men whose standing you report; we assure you of our good faith by being willing to pay you for that information, and we pledge ourselves to receive it as a confidential communication." These circumstances, repellant of the presumption of malice, constitute the substance and essence of privileged communications.

How, under these conditions, can the obligation be imposed upon the agency to make sure that the subscriber has a present interest in the persons reported, without narrowing the privilege, which has operated as a shield in the many cases referred to ?

Business methods have changed; every department of human activity is marked by progress. There must be a correct apprehension of legal principles as they apply to a progressive state of society, if we would keep pace with the march of events, and render the common law as true and unerring a guide in jurisprudence to-day as it has been in the past. It is the pride of the common law that it is sufficiently broad and elastic to adapt itself to the exigencies of the times, and to adjust itself to the new and ever varying conditions that may arise in the progress of the age.

The rule that a business man may inquire of his friend or his neighbor as to the responsibility of one who has applied for credit, answered well enough fifty years ago, but it is altogether inadequate to the present requirements of trade and commerce.

The law of *Sunderlin* v. *Bradstreet* would even suppress the prevalent practice in business circles of employing a credit clerk, to ascertain and report the standing of business men in the district which he canvasses. No man could safely answer his inquiries, and the clerk could not report to his employer, without being liable to prosecution. The old adjudications, relied upon to support the more narrow rule, are the declara-

tions of judges whose vision did not take in the widely different conditions which prevail in the affairs of men to-day. This doctrine utterly disables the agency to become capable of imparting even the information which it is conceded may lawfully be given. If the agency may furnish only to one having a direct interest, how would any one dare give the information to the agency, for, until some one having such interest has applied to the agency, the communication is within the prohibited class?

In my opinion, the defendants, in furnishing information to subscribers under the conditions imposed, are not subject to the presumption that they were moved by malice, and I therefore vote to reverse the judgment below.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, DEPUE, KNAPP, PARKER, BROWN, COLE, McGREGOR, PATERSON. 9.

*For reversal*—DIXON, MAGIE, VAN SYCKEL, CLEMENT, WHITAKER. 5.