# THE WASHINGTON GAS LIGHT COMPANY

*v.*

# LANSDEN.

LIBEL, LIABILITY OF CORPORATION FOR; PUBLICATION; MEASURE OF DAMAGES; PLEADING AND PRACTICE; INSTRUCTIONS TO JURY; PRIVILEGED COMMUNICATIONS; APPELLATE PRACTICE.

1. An article in a newspaper charging a party with having testified contradictorily and falsely before a committee of Congress from improper motives and in violation of his duty to his former employer is libellous *per se.*

2. Where the *data* for such article are furnished by the general manager of a corporation while acting on its behalf and within the scope of his authority, with knowledge that such *data* will be used in the preparation of the article, the corporation will be liable for the publication.

3. And in such case, the question whether the corporation sought to be held liable authorized or ratified the publication, or whether it was made or directed by its agents or servants in the course of their employment, is for the jury to determine.

4. An instruction in an action for libel that the jury shall award such damages as will compensate the plaintiff for injuries occasioned by the defendant's conduct, in estimating which they should take into consideration the language of the libel so far as it was inspired by defendants, the nature of the charges and imputations therein, the publicity given thereto, and the mental suffering occasioned the plaintiff, is free from objection, especially where accompanied by an instruction denying the right of plaintiff to punitive damages.

5. A letter containing *data* to be used, with the knowledge and consent of the writer, in the preparation and publication of a libellous article, and which is not written in pursuance of any duty, legal or moral, public or private, on the part of the writer, or those in whose behalf he is acting, is not a privileged communication; and to the extent of the authority, aid and assistance given to the actual composer and publisher of the libellous article the writer and those for whom he acts are liable.

6. Without the protection of a privileged communication, the publication of a libel is a wrongful act, presumably injurious to

the person libelled; and in the absence of legal excuse gives a right of recovery irrespective of the intent of the publisher, and this although he had reason to believe his statement was true and was actuated by honest and even commendable motives in its publication.

7. The objection, raised for the first time in the appellate court, that the verdict and judgment thereon are invalid in that while the action was against five defendants, who pleaded jointly not guilty, the verdict was against three of them only, and there was no finding either for or against the other two, comes too late.

No. 683. Submitted October 21, 1896. Decided December 9, 1896.

HEARING on an appeal by defendants from a judgment on verdict in an action for libel. *Affirmed.*

The COURT in its opinion stated the case as follows:

This is an action for libel brought by Thomas G. Lansden, the appellee, against the Washington Gas Light Company, John R. McLean, its president, Charles B. Bailey, its secretary, William B. Orme, its assistant secretary, and John Leetch, its general superintendent. The declaration charges that the defendants did compose and publish, and did cause and procure to be composed and published, a certain libel, set out in the declaration, of and concerning the plaintiff, and of and concerning certain testimony by him given before a committee of Congress, in a certain newspaper or periodical called "The Progressive Age," printed in the city of New York.

The defendants all pleaded not guilty, and issue was joined on that plea. The verdict and judgment were for the plaintiff against the Gas Company, Bailey and Leetch, but there does not appear to have been any verdict or finding for or against the other defendants. This appeal is brought by the defendants against whom verdict and judgment were rendered.

The article alleged to be libellous is set out *in extenso* in the declaration, and also in the bill of exception. It is headed, "The acrobatic performances of Lansden." It is

not pretended that any of the defendants actually composed the libel as published in' "The Progressive Age," but it is contended that some of the defendants, at least, furnished the data, and procured or conduced to the composition and publication of the article complained of as libellous; and though none of the defendants may have actually dictated the term's of the article, yet, it is contended, if they procured or conduced to the writing and publication of the libel, they are responsible therefor. In such case the libel is to be considered as published by their authority.

It appears that Lansden, the plaintiff, was in the employ of the defendant gas company as general superintendent of the gas works, from the 1st of November, 1886, until the 1st of June, 1893. He was by profession a gas engineer; his business being to construct and manufacture gas works and manufacture gas; and he had been engaged in that profession for about 30 years.

In January, 1893, action was taken by the House of Representatives looking to the reduction of the price of gas supplied by the defendant company to the Government buildings in the District of Columbia, to seventy-five cents per one thousand feet, and the plaintiff, Lansden, then in the employ of the gas company, was called upon by the president of that company to make a written statement of what he could testify to, if called as a witness before the committee of the House. He furnished such statement in his own handwriting, though he testifies and shows that some of the data thus furnished were supplied from the books of the gas company, for which he was in no wise responsible, and for the correctness of which he expressly disclaimed knowledge or responsibility at the time of delivering the statement to the president of the company. This statement, being placed in the hands of the president of the company, was thereupon placed in the care and keeping of Bailey, the Secretary, to be preserved for future use. The plaintiff, however, was not called upon as a witness at that

session of Congress; and, in the meantime, that is, on the 1st of June, 1893, the plaintiff left the employment of the gas company, and was succeeded in the office of general superintendent of the company by John Leetch, one of the defendants. At the next session of Congress, that is, in 1894, an investigation was directed in respect of the reduction of the price of gas to one dollar, instead of one dollar and twenty-five cents per thousand feet, the then existing price. Before the committee of that session of Congress, the plaintiff appeared and gave testimony, and which, apparently, was in conflict with and contradictory of the estimates made and set forth in the preceding statement made and delivered to the president of the company in 1893.

In the trial of this case, the plaintiff testified that he prepared a memorandum, at the request of the president of the company, in 1893, in the form of questions and answers, except that, as originally submitted to the president, the memorandum contained nothing as to the cost of gas; that the president said to him, "You say nothing here about the cost of gas," and he told Mr. McLean that the cost of gas must come from him, the president, or from the secretary; that he was thereupon furnished with a statement, putting the cost of gas in the holder at 48.38 cents per thousand, and the cost of distribution at 40.09 cents per thousand; that the plaintiff said to McLean at the time, "It cannot be possible that your gas costs that much," to which he, McLean, replied that they were entitled to charge interest on their investment, and that the plaintiff then wrote in those figures, stating at the time, "It does not make any difference to me. If the committee ask me, I will give these as your figures." The plaintiff further testified that the items of cost could only come from the books, which were kept at the office of the secretary of the company; that the plaintiff could approximate the cost of gas in the holder from knowing the amount of coal that was used, and the cost of labor, but that there were many items entering into its manufacture which

were not purchased by the plaintiff, and the cost of which was not furnished to him; that he never knew the actual cost of the manufacture of gas, and could not know it unless he had had access to the books of the company; that he never saw the books, either during his employment with the defendant company, or afterwards; and that it would have been impossible for him, estimating merely as an expert, and without the books of the company, to have figured the cost down to the hundredth part of a cent, as was done in the figures inserted in the memorandum.

The plaintiff further testified that he was not called as a witness on behalf of the defendant company in 1893, and gave no testimony before the committee that year. He states that the memorandum referred to was furnished for the private use of the defendant McLean, and was left with him for his own use. He further states that in February, 1894, an investigation was made by the Senate committee into the cost of the manufacture of gas, and the plaintiff, by invitation, appeared before that committee and testified that, in his opinion as an expert, gas could be put in the holder at from 30 to 32 cents per thousand feet, and could be distributed at from 20 to 22 cents per thousand feet.

After this testimony of the plaintiff had been given before the committee, and the same, or the substance thereof, published in the Washington City papers, there came a letter of inquiry from Mr. E. C. Brown, the publisher of "The Progressive Age," a journal or periodical published in New York City, of considerable circulation, and devoted to the interest of gas, electricity, and water supply companies; and which letter of inquiry was dated at New York, February 12, 1894, and was addressed to the Washington Gas Light Company, Washington, D. C. This letter was received by John Leetch, the general manager of the company. In the letter the writer says:

"I have watched with great interest the continued reports of the proceedings against your company, as published in

the local newspapers of your city, and I have been some-
what surprised at the character and extent of Mr. Lansden's
testimony. Was his statement correctly reported in the
'Washington Star' of the 3rd inst.? Newspapers all over
the country are taking up his figures and using them to suit
their own ends against home companies. Any information
you would care to give us concerning the object of Mr.
Lansden's attack will be considered confidential as to source
of information.

(Signed) "E. C. BROWN."

In reply to this inquiry the defendant Leetch, as general
manager of the defendant company, by letter dated Wash-
ington, D. C., February 13, 1894, acknowledged the receipt
of Brown's letter of the 12th of February, and says:

"As Mr. Lansden is no longer in the employ of the gas
company, the motive was generally understood that prompted
his statement. As the newspapers in Washington gave a
correct version of his statement, there is no doubt he said
that gas could be furnished at the meter for 70 cents and
to the consumer for $1.00 per 1,000 cubic feet. This price
at the meter was exclusive of repairs, services, etc.

"Under a former resolution of Congress, bearing date of
February, 1893, Mr. Lansden was called upon to answer
certain questions bearing upon the reduction of the price
of gas in Washington and made the following replies:

"'Q. What does gas cost to manufacture at your works?

"'A. It costs 48.38c. per thousand in the holder and
40.09c. per thousand for distribution.

"'Q. Can you in any way reduce the cost of gas in the
manufacturing, so your company could sell for less to the
consumer?

"'A. I know of but one way that a small amount could
be saved—that is, by reducing the salaries of our clerks and
the price paid to our laborers. This we would not like
to do.

" ' Q. How do the prices charged for lamps in Washington compare with other cities?

" ' A. They are as low as anywhere where the same amount of gas is burned to the lamp and the same number of hours lighted in the year, and when the company lights and cleans the lamps.'

" You will notice that he makes a difference of about $18\frac{1}{2}$ cents per 1,000 feet then as compared with his statement now, although he must know that the material used (coal) and labor is just the same now as then, except price of naphtha which is higher. You can try to reconcile the two statements.

(Signed)    " JOHN LEETCH,<br>
"<i>General Manager.</i>"

On the 14th of February, 1894, and again on the 19th of that month, Brown wrote to Leetch, addressing him as the general manager of the Washington Gas Light Company, requesting data as to the testimony of Lansden before the Congressional committee, with an avowed purpose of publishing and exposing its conflicting statements. In the first of these letters Brown, in referring to a previous letter to Leetch, says:

" Your statements, as contained therein, are exceedingly interesting, I can assure you. It would seem that the inference as to the occasion for the statement could only result from one cause.

" I would ask you, if you can do so without too much trouble to yourself, to give me categorically the questions propounded to Mr. Lansden and answered by him as reported in ' The Star' of the 3d inst. I should like to reproduce exactly the questions and his replies under the former resolution of Congress, February, 1893, and follow up with the same covering the present investigation. I will not ask you to hurry about this, for I cannot use the matter until our issue of the 1st of March, but then, I can assure you, I will take it up in the proper way. Any other facts of

interest that you can give me in this connection I shall appreciate."

In the second of these letters, that of February 19, 1894, Brown says:

"I hope you are intending to give me questions propounded to and answered by Mr. Lansden during the present investigation similar to the manner in which you gave me the questions then answered by him under the former resolution, as appears in your letter of the 13th. I am wanting to treat this matter in the way it should be touched on, and I have in mind publishing Mr. Lansden's testimony on this particular point side by side."

In reply to these two letters, asking for data to enable the publisher of "The Progressive Age" to prepare and publish the article complained of in the paper to be issued on the 1st of March, 1894, Leetch, on the 20th of February, 1894, writes to Brown, and says:

" This delay in reply was my inability to secure a copy of report of proceedings before investigating committee of Congress. Only about twenty copies have thus far been printed for use of committee. To-day I received a copy, which I herewith enclose for your use.

(Signed)   "JOHN LEETCH,<br>" <i>Gen'l Manager.</i>"

As will be observed, the first of the letters from Brown, that of the 12th of February, 1894, was addressed to the Washington Gas Light Company and answered by Leetch as general manager of the company, and the subsequent letters from Brown were addressed to John Leetch as the general manager of the company. These letters, it appears, were all placed among the files of papers in the office of the company, in the keeping of the secretary; and it further appears that the replies to these letters of Brown were copied in the letter-book of the company kept by the secretary. There is nothing to indicate that Leetch, in furnishing the data to Brown, was acting merely on his own individual

account and responsibility, irrespective of his character and position as general manager of the company, and for its benefit. On the contrary, it would clearly appear that he was acting in the interest of and for the company, in his character of general manager, and that such conduct was within the scope of his authority as such general manager of the affairs of the company. Indeed, there is nothing in the case that would even suggest that he had any mere personal interest or object to subserve in what he did, apart from the interest of the company. He was manifestly acting for the company, and as its officer and agent, and the jury have so found by their verdict.

On the 1st of March, 1894, the libellous article complained of appeared in "The Progressive Age." In that article various things are said in reference to the plaintiff Lansden, and among others it is stated, that " a Congressional committee has been investigating the Washington Gas Light Company. Complaints were lodged by some of the patrons of the company with the committee on the District of Columbia, which has jurisdiction in all matters affecting affairs connected with the capital city, and Congress ordered an investigation. Many witnesses have been heard on both sides of the question, and among them appeared Mr. Thomas G. Lansden, who had filled the position of superintendent with this company for a period of seven years prior to his resignation, in June of last year. This gentleman did not come forward, as might have been expected, to render such help as he could to assist his former associates over their present difficulties and to say a good word in behalf of the company with which he had so long been identified and by which he had been most generously requited; on the contrary, Mr. Lansden has arrayed himself within the ranks of those who sought to tear down and lay waste the business and emoluments of his former employers. Moreover, by reason of the nature of his testimony, Mr. Lansden has

caused a report of his statements to be circulated the length
and breadth of the land, and the subject matter contained
therein is well calculated to do the utmost harm to gas in-
terests everywhere.     Mr. Lansden's statements, as made
under oath before this investigating committee, have been
telegraphed from one end of the country to the other, and
newspapers in many of the principal cities throughout the
United States have copied the statements which have ap-
peared in all Washington papers during the progress of the
investigation.     To what extent is best shown when we say
that more than a score of newspapers containing Mr. Lans-
den's statements about the cost of making and distributing
gas have come to our notice since his testimony was given,
and the end is not yet.     The figures of cost supplied by Mr.
Lansden are startling, to say the least, and more than one
gas company will, we apprehend, ere long, find itself con-
fronted with his figures and compelled to battle hard in an
effort to overcome the bad effects on the public mind.

   " It is because of the general interest that is likely to
suffer for Mr. Lansden's indiscretion that we give heed to
the matter, not through a desire to extend special favor to
the Washington company; nor is it because of any ill-will
entertained by us for Mr. Lansden.     If the cause of the
company is just, as we believe it to be, it will come out of the
investigation a victor.     The present investigation is not the
first in which Mr. Lansden has appeared as a witness.     Only
a year ago a similar inquiry, emanating from the same
quarter, was instituted against the Washington Gas Light
Company.     Then Mr. Lansden appeared as a witness in be-
half of the company.     He at that time occupied the position
of superintendent with the company.     His testimony then
and that of this year are so sadly at variance that we should
be remiss in our duty if we permitted the occasion to pass
without directing attention to these differences.     Moreover,
we should be guilty of withholding from gas managers

information which will be of material assistance to them in breaking the force and effect of Mr. Lansden's recent statement.

"Under a former resolution of Congress bearing date of February, 1893, Mr. Lansden was called upon to answer certain questions bearing upon the reduction of the price of gas at Washington. We herewith give the questions propounded to Mr. Lansden during the investigation of last year and his replies thereto. This we follow with the interrogatories put to him and his answers during the present investigation."

The writer then proceeds to set out, *in totidem verbis*, for the purpose of showing the variant and conflicting statements in the testimony of the plaintiff, the interrogatories and answers of 1893, being those furnished by the defendant Leetch in his letter of February 12, 1894, to Brown, and the interrogatories of 1894, being those, as we may suppose, that were furnished by Leetch in his letter of February 20, 1894, enclosing copy of the report of the committee of Congress, to be used by Brown.

The writer of the libellous article then proceeds:

"From the foregoing extracts of this witness' testimony only one of two conclusions can be arrived at, and we are too sensible of the reader's powers of analysis and feel too keenly for the witness to heap coals of fire on the head of one who, it is only too evident, has allowed his sense of justice to be distorted by real or fancied grievances. The testimony given by Mr. Lansden in 1893 states in effect that there is no way open to his company by which it could reduce the cost of manufacturing gas. In 1894 he tells the committee that, taxes and repairs added—items not considered in the inquiry of the previous year—the cost of gas delivered to the consumer could be brought within 70 cents, or about $18\frac{1}{2}$ cents less per thousand than he quoted as the lowest manufacturing and distributing cost the year

before ; and yet Mr. Lansden must know that the generating apparatus at the Washington works is the same as when he filled the position of superintendent ; that the cost of all materials used, coal and labor, are just the same, save only naphtha, which is now higher in price than when he testified a year ago.

" Every man must be the custodian of his own conscience, and it is not for us to decide how Mr. Lansden will reconcile himself to his present unhappy position.   If the gentleman has given up all thought of again associating himself with a gas enterprise, possibly he is indifferent to the effect of his predicament, but if he still entertains an idea of continuing his former calling he should lose no time in setting himself straight in the eyes of his former associates.   In view of the testimony, we can readily believe this will prove a most difficult undertaking ; but there is always two sides to a story, and possibly Mr. Lansden may have in reserve some evidence that will enable him to sustain his present position. If so, our columns are open to him for such purpose."

[The second and third instructions granted on behalf of the plaintiff, over the objection of defendants, and which are referred to in the opinion of the court, are as follows :

" 2. If the jury shall find from the evidence each and every of the several questions of fact set forth and submitted to them in the foregoing first instruction in favor of the plaintiff, and if they shall further believe from the evidence that the figures as to the cost of the manufacture and distribution of gas set forth in the paper which has been referred to as the answers of Lansden in 1893, as they appear in said answers, were furnished Mr. Lansden from the books of the company for the purpose of being inserted in said paper and were not figures produced or arrived at by him personally, as to the cost of either such manufacture or distribution ; and if they further believe from the evidence that the defendant Charles B. Bailey well knew that

said figures were so furnished said Lansden from the company's books, and that they did not represent said Lansden's own estimate or knowledge of the cost of either the manufacture or the distribution of gas, but that the said defendant, Bailey, nevertheless, on being shown by Mr. Leetch the letter of E. C. Brown of February 12, asking information in reference to the testimony given by Mr. Lansden in 1894, called the attention of said Leetch to the said so-called Lansden answers of 1893, and gave them to him for the purpose of enabling him to communicate them to said Brown as Lansden's own statement in regard to the actual cost of such manufacture and distribution, and as tending to impeach his sworn testimony before the committee of Congress in 1894, and maliciously intended that the same should be communicated to said Brown for the purpose aforesaid, then the jury would be justified in finding for the plaintiff against the defendant Bailey as well as against the defendants Leetch and the Washington Gas Light Company.

"3. If, under the testimony and the instructions of the court, your verdict shall be for the plaintiff as against any of the defendants, then it is your duty to award the plaintiff as against such defendants such damages as you believe from the evidence shall fully compensate him for the injuries, if any, suffered by him from the conduct of said defendants complained of in the declaration and which you shall find sustained by the proofs, in estimating which damages you may consider the language used in the publication complained of, in so far as you shall find from the evidence that said language was inspired by said defendants, the nature of the charges and imputations conveyed by said language, the vehicle used in giving publicity to the same, and the mental suffering, if any, which you find from the evidence has thereby been occasioned to the plaintiff."—RE-PORTER.]

*Messrs. Webb, Webb & Lindsley* and *Mr. W.'D. Davidge,* for the appellants:

1. The libel complained of is set out in these words: " A certain false, scandalous, malicious, and defamatory libel of the tenor following, to wit." By the use of this form of pleading he has bound himself to set out *verbatim* the libel complained of, and must follow it up by showing the act of publication by these defendants of that libel, and if there be a variance between the form of the libel alleged and the proof it is fatal. *Wright* v. *Clements,* 3 B. & Ald. 503.

" Tenor " imports identity, and whenever that is destroyed, either by the omission or adoption of any one word, however slightly the sense may be affected, it will be regarded as a fatal variance. *State* v. *Townsend,* 86 N. Car. 676; *State* v. *Bonney,* 34 Me. 383; *People* v. *Warner,* 5 Wend. 271; *Com.* v. *Wright,* 1 Cush. 65; *State* v. *Johnson,* 26 Iowa; *Com.* v. *Stevens,* 1 Mass. 203.

Any allegation which narrows and limits that which is essential, becomes descriptive and must be proved as alleged. Thus, in contracts, libels in writing and written instruments in general, every part operates by way of description of the whole. Greenleaf on Evidence, Secs. 58, 59, 60; Newell on Defamation, 804; *Perry* v. *Porter,* 124 Mass. 339; *Crotty* v. *Morrissey,* 40 Ill. 477; *Chapin* v. *White,* 102 Mass. 139; *Gates* v. *Bowker,* 18 Vt. 23; *Strader* v. *Snyder,* 67 Ill. 404; *Parkes* v. *Prescott,* L. R. 4 Ex. 168; *Adams* v. *Kelley,* 21 E. C. L. 157; *Whiting* v. *Smith,* 13 Pick. 371; *Griffin* v. *State,* 14 Ohio St. 55.

The form and substance alleged and the form and substance proved differ so immensely that the variance is manifestly fatal. *Stanfield* v. *Boyer,* 6 H. & J. 248; *Winter* v. *Donovan,* 8 Gill, 370; *Robinett* v. *Ruby,* 13 Md. 100; Newell on Defamation, p. 804; *Waller* v. *Graves,* 20 Conn. 305.

2. The defendants are chargeable only, if chargeable at all,

with the letter of Leetch to Brown; and applied to that letter, as part of the alleged libel, the innuendo wholly fails, because that letter is insufficient as an inducement to support it.    Townsend on Libel, Sec. 336; *Havemeyer* v. *Fuller*, 60 N. Y. 316; *Salvatelli* v. *Ghio*, 9 Mo. App. 155; *Bloss* v. *Tobey*, 2 Pick. 320.

3. The law of libel as to what words are deemed sufficient in law to amount to a charge of perjury is very strict and technical.    *Hopkins* v. *Beedle*, 1 Caines, 347.    Perjury is the wilful giving, under an oath or affirmation legally imposed, of false testimony material to the issue or point of inquiry. The following elements are essential to constitute this crime: First, the oath must be false; second, it must have been legally imposed; third, the intention must have been wilful.    *Schmidt* v. *Witherick*, 29 Minn. 156; *Sheely* v. *Biggs,* 2 H. & J. 363; Townsend on Libel, Sec. 321; *Ward* v. *Clark*, 2 Johns. 9; *Stafford* v. *Green*, 1 Johns. 505.    What the letter said was strictly true; he was ",called upon to answer certain questions and made the following replies," according to all the evidence, including that of the plaintiff himself.    There is nowhere in the letter the remotest intimation that the statement was made before a committee instead of being made at the instance of McLean, the president of the company.

4. Publication is the very essence of slander or libel, and to make a party responsible he must have participated directly or indirectly, by request or its equivalent in conduct or words.    *Parker* v. *Prescott*, Law Rep. 4 Ex. 168; *Adams* v. *Kelly*, Ry. & Mood. 157; *Rex* v. *Cooper*, 8 Q. B. 533; *Cochran* v. *Butterfield*, 18 N. H. 115; *The King* v. *Johnson*, 7 East, 65.

It is no answer to the proposition that the issue of causing or procuring was to be found by the jury to say that causing or procuring the publication of the alleged libel followed as an inference from the alleged purpose or knowledge.    This is not so; but even if it was, the defendants were entitled

to have that inference tried by the jury as part of the issue. It was an inference of fact and not a presumption of law, and necessarily belonged to the jury.

The republication is not in law the natural and proximate consequence of the original slander or libel. This is settled by many decisions. Townsend on Slander and Libel, Secs. 112, 117; *Ward* v. *Weeks*, 7 Bing. 211; *Tunnecliffe* v. *Moss*, 3 Car. & K. 83; *Barnett* v. *Allen*, 1 F. & F. 125; *Dixon* v. *Smith*, 5 H. & N. 450; *Parkens* v. *Scott*, 1 H. & C. 153; *Stevens* v. *Hartwell*, 11 Metc.; *Terwilligen* v. *Ward*, 17 N. Y. 54; *Gough* v. *Goldsmith*, 44 Wis. 262; *Hastings* v. *Stetson*, 126 Mass. 323; *Shurtleff* v. *Parker*, 130 Mass. 130.

The exception to the rule is where the first publication places the party to whom it is made under an obligation, legal or moral, to repeat or republish. Odgers on Libel and Slander, * pp. 136, 332, 333, 334. *Mullin* v. *Butler*, 6 Cush. 71.

Even if the letter suggested or inspired publication the authority to publish was confined to the contents of the letter. The alleged libel far transcended, in sense and substance, the contents of the letter.

A party publishing a slander or libel is not responsible for its republication by another unless the latter is requested to republish.

5. Undoubtedly a party may give general authority to defame, and if he does so is bound by whatever his agent may do. *Reg.* v. *Cooper*, 8 Ad. & El. 532, 536. On the other hand, the authority may be limited, and in such case the party giving it is not liable, civilly, for what the agent may do beyond the authority. There is a distinction between civil and criminal proceedings. In the latter, a party is not allowed to qualify the wrong. *Parker* v. *Prescott*, L. R. 4 Ex. 168. In the present case it cannot be pretended that Brown was made an agent, general or special.

6. It is a matter of law for the judge to determine whether the occasion of writing or speaking criminatory language,

which would otherwise be actionable, repels the inference of malice, constituting what is called privileged communications. *Cooke* v. *Wildes*, 85 E. C. L. 328; *Taylor* v. *Hawkins*, 71 E. C. L. 307; *Shurtleff* v. *Stevens*, 51 Vt. 501. In case of privileged communication malice must be proved, and therefore its absence must be presumed until such proof is given. *Somerville* v. *Hawkins*, 70 E. C. L. 583; *Simmons* v. *Holster,* 13 Minn. 249.

The rule as to what constitutes a privileged communication is thus stated in *Davies* v. *Snead*, 5 L. R. Q. B. 611 : " That when a person is so situated that it becomes right in the interests of society that he should tell to a third person certain facts, then if he *bona fide* and without malice does tell them, it is a privileged communication." See also W*aller* v. *Loch*, 7 L. R. Q. B. D. 622; *Sanderlin* v. *Bradstreet*, 46 N. Y. 191; *Lewis* v. *Chapman,* 16 N. Y. 369; *Bradley* v. *Heath*, 22 Pick. 163; *Railroad Co.* v. *Richmond*, 73 Tex. 568; *Marks* v. *Baker*, 28 Minn. 162. And this would be so although the duty be not strictly legal, but of imperfect obligation to a person having a corresponding interest or duty. *Van Wyck* v. *Aspinwall*, 17 N. Y. 191; *Harrison* v. *Bush,* 5 El. & Bl. 344.

Moreover, the question is not whether the statements, contained in the letter of Leetch, are true or not, as a matter of fact. *Spill* v. *Maule*, L. R. 4 Ex. 237; *Davis* v. *Snead*, L. R. 5 Q. B. 608; Townsend on Libel, Sec. 241, p. 209; *Maitland* v. *Bramwell*, 2 Fost. & Fin. 623; *Chatfield* v. *Comerford*, 4 Fost. & Fin. 1008. If a man *bona fide* writes a letter in his own defence and protection of his interests and rights, and is not actuated by any malice, that letter is privileged, although it may impute dishonesty to another. *Coward* v. *Worthington*, 7 Car. & P. 528; Townsend on Libel, Sec. 240.

7. There is no evidence upon which the jury could find against the defendant Gas Light Company, for the evidence is conclusive that no authority was delegated to Leetch other

than such as pertained to the executive management of the works, the manufacture of gas and the material and personnel belonging thereto, and nothing else.

The law demands as a prerequisite to the responsibility of the master for the servant's wrongful acts, that the particular matter in which the servant has done wrong shall be one which the master has intrusted to the servant; and the ground is, that for reasons of public policy he is chargeable with the duty and responsibility of selecting for such position a proper person to perform the duties entrusted to him. *Sleath* v. *Wilson*, 9 Car. & P. 607; *Railroad Co.* v. *Derby*, 14 How. 468; *Railroad Co.* v. *Quigley*, 21 How. 210; *Steamboat Co.* v. *Brockett*, 121 U. S. 637; *Railroad Co.* v. *Harris*, 122 U. S. 587.

The question in each case is one of proof of the fact that the particular act done was in relation to a duty entrusted to the official whose act it is alleged binds the company, and the company is entitled to all the assumptions of law that it conducts its business in the regular way, known and recognized by all who ever come in contact with corporations and deal with their officers in business. *Hawes* v. *Knowles,* 114 Mass. 518; *Fogg* v. *Railroad Co.*, 20 N. E. Rep. 109; *Freeborn* v. *Machine Co.*, 2 Man. 253; *Express Co.* v. *Fitzner,* 59 Miss. 581; *Harding* v. *Greening,* 8 Taunt. (E. C. L.) 42; *Carter* v. *Machine Co.*, 51 Md. 290; *Railroad Co.* v. *Downey,* 18 Ill. 259; *Isaacs* v. *Railroad Co.*, 47 N. Y. 122.

8. The verdict finding only part of the issue is void. The jury was sworn to try the whole issue, and not part of it. The verdict was against three, and silent as to the others. Such a verdict is void, and a judgment thereon will be reversed. Bacon's Abridgment: "Verdict" (M). A *venire de novo* is grantable where the verdict finds less than the whole matter put in issue; 2 Tidd's Practice, 922; *King* v. *Dean*, 3 T. R. 128; *United States* v. *Watkins,* 3 Cranch C. C. 575; *Patterson* v. *United States*, 2 Wheat. 221; *Downey* v. *Hicks,* 14 How. 246; *Garland* v. *Davis,* 4 How. 147; *Hodges*

v. *Easter*, 106 U. S. 408 ; *Browne* v. *Browne*, 22 Md. 103 ;
*Ford* v. *State*, 12 Md. 515 ; *State* v. *Carleton*, 1 Gill, 250 ;
Am. & Eng. Encyc. L., Title Verdict, Vol. 28, p. 285.

*Mr. J. J. Darlington* and *Mr. J. Altheus Johnson* for the
appellee.

1. The authorities cited by appellants on the subject of
variance are, without exception, cases recognizing and ap-
plying the well-established principle of pleading that, where
the libel offered in evidence differs, even in slight verbal
particulars, from the libel set out in the declaration, the dif-
ference is one of description, and will constitute a fatal var-
iance.

The legal proposition involved relates only to identity of
description in pleading. It does not require that, when the
article declared on is identical with the article offered in
evidence, the party charged with causing or procuring its
publication shall, nevertheless, escape responsibility, if the
libel, though substantially his, is not wholly in his phrase-
ology, or contains comments and additions by the party
whom he has caused or procured to publish it. The rule
and the reason of it are clearly laid down as far back as
*Queen* v. *Drake*, 3 Salk. 224. See also *Commonwealth* v.
*Rannen*, 2 Gray, 291.

In the case at bar there is no variance between the libel
declared upon and that offered in proof. Every part of the
publication charged by the plaintiff under the innuendo as
constituting the libel is clearly found by the verdict to have
been communicated by the appellees to Brown in aid of his.
express purpose to publish appellee's testimony upon this
particular point " side by side."

" The rule is that the words proved must substantially
correspond with those alleged in the declaration. It is not
necessary to prove all the words laid, unless they constitute
one entire charge . . . The absence of proof to show

that he also uttered the other words imputed to him does not, under the rule laid down, constitute a material variance." *Coghill* v. *Chandler*, 33 Mo. 115; see also *Lewis* v. *McDaniel*, 82 Mo. 577; *Casey* v. *Hubechon*, 25 Mo. App. 91; *Purple* v. *Horton*, 13 Wend. 9; *Barr* v. *Gaines*, 3 Dana, 258; *Dufresne* v. *Weise*, 46 Wis. 290; *Scott* v. *McKinnish*, 15 Ala. 662; *Miller* v. *Miller*, 8 Johns. 74; *Purcell* v. *Archer*, 7 Tenn. 317; *McClintoch* v. *Crick*, 4 Iowa, 459; *Compagnon* v. *Martin*, 2 Wm. Bl. 790; *Baker* v. *Young*, 47 Ill. 42; *Loomis* v. *Snick*, 3 Wend. 205; *Nestle* v. *Van Slyck*, 2 Hill, 282.

In all of the authorities cited by the appellants there was variance between the libel as set forth in the declaration and that offered in evidence. Authorities are not wanting, however, either here or in England, upon the question presented in this case; and upon it, it is believed, they are entirely harmonious. *Strader* v. *Stryder*, 67 Ill. 405; *Adams* v. *Kelly*, 20 E. C. L. 403; *Miller* v. *Butler*, 6 Cush. 71; *Howe Machine Co.* v. *Sonder*, 58 Ga. 64; *Clay* v. *People*, 86 Ill. 147; *Reg.* v. *Cooper*, 55 E. C. L. 533; *Parker* v. *Prescott*, L. R. 4 Ex. 169.

2. The court below did not err in submitting to the jury the question whether the publication was caused or procured by defendants upon all the facts as disclosed by the evidence, and in refusing to instruct them that defendants were not liable, unless they requested or solicited the publication. It is not essential to legal liability for causing or procuring an act that such causing or procuring should have been through the instrumentality of an express request.

3. The question whether the letter of February 13 was a privileged communication was one to be determined by the trial judge upon all the facts and circumstances in evidence. Newell, Defamation, Sl. and Libel, 389. No evidence was offered tending to show any relation of duty, trust, confidence or obligation of disclosures of any kind between the appellants and the Progressive Age. A "privileged communication" is one made upon such occasion as

rebuts the presumption of malice, and the description of cases so recognized is such as are founded upon some recognized obligation or motive, legal, moral, or social, which may fairly be presumed to have led to the publication, and, therefore, *prima facie* relieves it of the implication from which the general rule of law is deduced.   Townsend on Sl. & Libel, 299 and citations; Newell on Sl. & Libel, 389.

To constitute a privileged communication, it must appear that the party had a right, or was under some obligation, to give the information which was believed to be true; the mode and style must not contain intrinsic evidence of malicious intent over and above what is reasonably necessary and proper in conveying the information, and it must be free from attendant and concomitant extrinsic circumstances showing malicious intent. *Hall* v. *Parsons*, 23 Tex. 9 ; Polk. Starkie on Sl. & Libel, 681, Sec. 679 ; see also, *White* v. *Nichols*, 3 How. 266 ; *Bronson* v. *Bruce*, 59 Mich. 467 ; *Hunt* v. *Bennett*, 19 N. Y. 173.   And see, as to the inefficiency of belief as a defence: *Aldrich* v. *Wilcox*, 81 Ill. 77 ; *Fountain* v. *West*, 23 Iowa, 9 ; *Sand* v. *Joervis*, 14 Wis. 722 ; *Dole* v. *Lyon*, 10 Johns. 447.

Even in an action against the publisher of a newspaper, and where the freedom of the press is accordingly involved, statements imputing crime, if not based upon any facts tending to prove the crime, are not privileged. *People* v. *Post and Tribune Co.*, 54 Mich. 462.

Even if the misrepresentation in regard to figures given by Lansden had been unintentional and through ignorance or mistake, which is not claimed, and if the supposed interest of gas manufacturers generally in refuting his testimony as to the cost of gas can be held to have rendered communication to them of the contents of the libel a privileged communication, causing such communication to be made to the world through the columns of a public newspaper cannot be so regarded. *Beardsley* v. *Tappan*, 5 Blatch. 497 ; *Sanderlin* v. *Bradstreet*, 46 N. Y. 188 ; *Hunt* v. *Bennett*, 19

N. Y. 173. *Railroad Co.* v. *Quigley*, 21 How. 202, would seem to be conclusive that the publication in a newspaper cannot be held a privileged communication.

4. The jury may infer from circumstances that an act of a corporation's employee is done in the course of his business as its servant; and, if so done, and the act is libellous, the corporation is guilty of libel, even though the act is in excess of the agent's authority and wrongful. *Fogg* v. *Railroad Co.*, 148 Mass. 513; *Railway* v. *Harris*, 122 U. S. 597; *Salt Lake City* v. *Hollister*, 118 U. S. 256; *Railway* v. *Prentice*, 147 U. S. 113; *Williams* v. *Ins. Co.*, 57 Miss. 764.

5. Where the verdict is defective in not finding all the facts essential to a judgment, but is free from objection as to those which it does find, the authorities are harmonious to the effect that the *venire de novo*, if awarded, should be extended only to the issues not determined by the verdict, leaving those which are found by it to stand undisturbed. *Hughes* v. *Hughes*, 15 M. & W. 701; *Fletcher* v. *Marshall*, Id. 765; *Baxter* v. *Nurse*, 6 M. & G. 942; *Lambert* v. *Fogg*, 49 N. H. 310; *Lisbon* v. *Lyman*, 49 N. H. 582; *Wood* v. *Wood*, 52 N. H. 422; *Dexter* v. *Codman*, 148 Mass. 421.

If it were necessary to award a trial *de novo* in this case because of the omission to find specifically as to the defendants McLean and Orme, the issues thereunder, according to the authorities, should properly be restricted to the guilt or innocence of those defendants, and the findings thereunder, whatever they were, would in no way alter the judgment as to the appellants, who, accordingly, can have nothing of which to complain. The omission to find against the defendants McLean and Orme, under the practically unanimous current of authority, is to be treated as a verdict in their favor; or, if not so, it is a mere irregularity, to be cured by *non-pros.* as to them, either here or in the court below; and is, moreover, an irregularity of which, inasmuch as it does not injuriously affect or concern them, and espe-

9 Ct. App.—35

cially as it was not excepted or objected to by them in the trial court, the appellants have no right to complain.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

It has not been seriously contended that the article itself as published is not libellous; but the question is, who are liable for the publication? Any and all publications in writing or in print, imputing to another crime, or disgraceful, or fraudulent, or dishonest conduct, or which are injurious to the private character or credit of another, or which tend to render a party ridiculous or contemptible in the relations of private life, are libellous, and an action for damages is maintainable against the writer and publisher, unless the publication is embraced within that class of communications which are termed privileged communications, or unless the libeller can prove the truth of the libel. *Digby* v. *Thompson*, 4 B. & Ald. 821. And so, if, by such writing or print, it be imputed to a party that he is unfit to be trusted with money, or that he is guilty of treachery or ingratitude to his friends and benefactors, or of misconduct in an office of trust, an action will lie. *Cheese* v. *Scales*, 10 M. & W. 488,

Of course there can be no question at this day as to the right of the plaintiff to maintain an action for libel against the gas light company, a corporation, if the corporation has authorized or made itself liable in any manner for the publication of the libel. *Phil., Wilm. & Balto. R. Co.* v. *Quigley*, 21 How. 202; *Fogg* v. *Boston & Lowell R. Co.*, 148 Mass. 513.

In this case, as we have stated before, the principal question is, whether the defendants, or any of them, against whom the judgment below was rendered, are or is responsible for the publication of the libel set out in the declaration? It is conceded that the alleged libel was not actually written and published, in the terms of the article printed in "The Progressive Age," by any of the defendants; but it is

contended that the article was composed and published by their authority or procurement, or that they conduced to such publication.

In 2 Starkie on Libel and Slander (2d Eng. Ed.) 28, it is said " that the declaration generally avers that the defendant published and caused to be published ; but the latter words seem to be perfectly unnecessary, either in a civil or criminal proceeding; in civil proceedings the principal is to all purposes identified with the agent employed by him to do any specific act. A consent by the master to the act of the servant in printing a libel is *prima facie* evidence of publication by the master, and an allegation that the defendant published the libel is satisfied by proof that it was published by his agent, if an authority from the principal to the agent can be proved." And again, at page 225, of the same volume, it is laid down by the author as text law, that, " according to the general rule of law, it is clear that all who are in any degree accessory to the publication of a libel, and by any means whatever conduce to the publication, are to be considered as principals in the act of publication; thus, if one suggest illegal matter, in order that another may write or print it, and that a third may publish it, all are equally amenable for the act of publication, when it has been so effected."

And in the work of Sir Frederick Pollock on the Law of Torts, p. 168, in treating of the law of defamation, the author says: "On the general principles of liability, a man is deemed to publish that which is published by his authority. And the authority need not be to publish a particular form of words. A general request, or words intended and acted on as such, to take public notice of a matter, may make the speaker answerable for what is published in conformity to the general sense and substance of his request."

This principle would seem to result from an obvious principle of reason and justice; for otherwise an irresponsible

person might be put forward, and the person really produc-
ing or inciting the publication, and without whose contribu-
tion it would not likely ever have been published, might re-
main in entire safety. This would not be according to the
well settled principles of law, which intend that a party who
really instigates or incites a wrongful act shall be responsi-
ble therefor.

This principle of liability, as applied in the case of libel,
is very fully and clearly illustrated and enforced in the case
of *Parker* v. *Prescott*, L. R. 4 Exch. 169, in the Exchequer
Chamber. That action was against two defendants, and the
question turned upon the sufficiency of the evidence to hold
the defendants liable for the publication of the libel. The
learned judge before whom the case was tried at *nisi prius*
thought the evidence insufficient, and directed a verdict for
the defendants. The case was taken on bill of exception
into the Exchequer Chamber, and was there heard before
five judges, three of whom held the ruling below to have
been erroneous. They held it to be clear law, that where a
man makes a request of another to publish defamatory mat-
ter, of which for the purpose he gives him a statement,
whether in full or in an outline, and the agent publishes
that matter, adhering to the sense and substance of it, al-
though the language be to some extent his own, the man
making the request is liable to an action as the publisher.

The case was held under advisement, and the learned jus-
tice, in delivering the opinion of the majority of the court,
said : " The libels complained of were the reports of certain
proceedings at a meeting of the board of guardians for the
parish of St. Marylebone, which were published in some
local newspaper. It appeared in evidence that at the meet-
ing a discussion took place respecting the conduct of the
plaintiff towards his daughter, who was then an inmate of
the workhouse, and the history of the case, as stated at the
meeting, in the absence (be it observed) of the plaintiff, and

the remarks made upon it, were of a highly defamatory nature; indeed, the story was spoken of by one of the defendants at the meeting as a very scandalous case with reference to the conduct of the plaintiff. The defendant Prescott was chairman of the meeting, and Ellis, the other defendant, was also present, taking part in the proceedings. Reporters of local newspapers, in which the libel appeared, attended the meeting. The following evidence was given to connect the defendants with the publication. The defendant Ellis said he hoped the local press would take notice of this very scandalous case, and requested the chairman to *give an outline of it.* This was done by several members of the board, and the chief facts were then taken down by the reporters. The defendant Prescott also said, in the course of his statement relative to the case: ' I am glad gentlemen of the press are in the room, and I hope they will take notice of it.' On which the other defendant Ellis said, 'and so do I.' The defendant Prescott also said he hoped publicity would be given to the matter. It was proved by the reporters that the reports published were a correct summary of what took place, and one of the reporters stated that he had told the editor of the paper what the defendants had said before the publication."

It was contended that what was said by the defendants did not amount to a request to the reporters to publish the proceedings, but was a mere expression of a wish or hope that such proceedings should be published. In answer, however, to this contention the court said: " But upon consideration of the circumstances of this case, I think there was evidence for the jury on the two questions which ought to have been submitted, viz: First, of a request to publish the proceedings of the meeting relating to the plaintiff's conduct; and, second, that the reports contained a correct account of the proceedings as the defendants meant it should appear."

After stating the evidence bearing on these questions of

fact, the court proceeded to say: "Whether the libellous matter published is in pursuance of, and in accordance with, the request, or a departure from it, and so unauthorized, would be a question to be considered on the circumstances of the particular case." And further on, in answer to the argument for the defence, the court said: "It was strongly urged for the defendants, that they could not be liable unless they authorized the libel in the very words in which it was published. If this argument is correct, then it must follow that a man could never be liable when he desired another to make and publish an outline or summary of a speech or writing, because such an outline or summary necessitates condensation and consequent alteration of language. But the argument cannot, as it seems to me, be correct. The man who requests another to make and publish an outline or summary of a speech, writing, or proceedings, must know that the words will be to some extent those of him who makes such summary or outline, and he must, therefore, be taken to constitute him an agent for the purpose, and be answerable for the result, subject always to the question whether the authority has been really followed. If this be not so, a man might become a libeller with immunity. Again, if the very words of the libel and not its substance, are in these cases to be regarded, a man who gives the manuscript of a libel to an agent to print and publish would not be answerable, if by accident or negligence there were variations in some of the words, although not in the substance of the libel." The ruling of the court below was reversed, and a new trial ordered.

In all such cases as the present it is a question for the jury to determine whether the corporation sought to be held liable had authorized or ratified the publication, or whether the publication complained of was made or directed by its servants or agents, in the course of their employment. *Fogg* v. *Boston & Lowell R. Co.*, 148 Mass. 513. In this case, as we have seen, the defendant Leetch was the general manager

of the business and affairs of the gas company, and it was fully within the scope of his duties as such general manager, to protect and look to the general welfare of the company. In these and other circumstances there was evidence furnished to be submitted to the jury, to establish the fact that the libel was published by the authority of Leetch, while acting for and on behalf of the company, and within the scope of his authority as such general manager.

This question of fact was fully and fairly submitted to the jury by the first instruction given at the instance of the plaintiff, and as modified by the court. There was a redundancy of phraseology employed, it is true, but there is nothing in the language that could mislead the jury. The plaintiff's case as against the gas company and its general manager was fully embraced by that instruction. By that instruction the jury were directed, that if defendant Leetch wrote and sent the letter of the 13th of February, 1894, to Brown, in the course of his duties as general manager of the defendant company, knowing Brown to be the publisher of " The Progressive Age," a paper devoted to the interest of gas producers, " then it was a question for the jury to determine, from all the facts and circumstances of the case whether the said letter was or was not so written and sent for the purpose of supplying the data which it contains for a publication in said 'Progressive Age,' or with the knowledge that it was likely to be or probably would be used for such purpose; and if the jury believe from the evidence that it was so written and sent maliciously for such purpose or with such knowledge, and that the article complained of in the plaintiff's declaration was in fact published and circulated in said ' Progressive Age,' then, to the extent that the contents of said article were suggested and inspired by said letter, if the jury shall believe from the evidence that such contents were so suggested and inspired, the defendant gas company and the defendant Leetch are legally responsible for the publishing of said article; and if the jury believe

from the evidence that said article falsely and maliciously charges the plaintiff with having testified contradictorily and falsely before any committee of Congress, from improper motives and in violation of his duty to the Washington Gas Light Company, his former employer, and that such charges were fairly and naturally suggested and inspired by said letter, then the plaintiff is entitled to a verdict against the defendants the gas company and Leetch."

To this instruction the court added the following, as a qualification or explanation :

" But if you believe from the evidence that they communicated any false and libellous matter about the plaintiff to said Brown, knowing it to be false, with the intent or consent, express or implied, that the same should be published, you will be justified in finding malice therefrom, unless you shall believe from the whole evidence that no malice existed. The meaning of malice as here used is not confined to its ordinary meaning of hatred or ill will, but means also an intention to injure the plaintiff or a reckless disregard of his rights and of the consequences which might result to him from the false publication."

With respect to the defendant Bailey, the second instruction given on request of the plaintiff presents a case against him, upon the assumption of the truth of the facts therein stated. There was evidence sufficient tending to establish those facts. And the court committed no error in refusing to direct a verdict in favor of any of the defendants against whom the jury found a verdict. There was no ground for contending that there was any such fatal variance between the libel set forth in the declaration and the evidence, as would defeat the action as against the defendants found, guilty by the verdict of the jury.

In regard to the third instruction given on request of the plaintiff relating to the question of damages, we do not understand that there is any serious objection to that instruction. It would seem to be quite free from any substantial

ground of objection. And in this connection, it is proper to observe, that the jury were expressly instructed by the fourteenth prayer of the defendants, which was granted by the court, that the plaintiff was not entitled to recover punitive damages against any of the defendants. Hence the ruling of the court in admitting evidence as to the financial condition of the defendant, the gas company, could not be prejudicial to the defendants, and that ruling, therefore, does not constitute reversible error.

The defendants offered twenty-one prayers for instruction to the jury; but of this number only four were granted. There were many questions attempted to be raised by the prayers that were rejected. Only a portion of them, however, are made the subjects of error specially assigned in this court.

By the seventh prayer of the defendants, the court was asked to instruct the jury that if they should find from the evidence that the defendants did not request or solicit the publication of the article in " The Progressive Age," and that the article set out in the declaration was published without their knowledge, then their verdict should be for the defendants. This the court refused for obvious reasons. It plainly ignored the evidence as to one of the defendants, at least; and instead of the prayer thus offered, the court instructed the jury, "that if they should find that the defendants did not request, solicit, *intend, or inspire* the publication of any article in ' The Progressive Age ' of and concerning the plaintiff, and that the article set forth in the plaintiff's declaration was published without their knowledge *or procurement, directly or indirectly,* then their verdict should be for the defendants and for each defendant not so participating in the publication thereof."

The defendants excepted to the refusal of their prayer and to the granting of the substitute therefor.

Some of the terms employed in the substituted instruction are objected to as being indefinite and inappropriate.

Whether the terms objected to are the most appropriate
that could have been selected to express the thought in-
tended to be conveyed by the instruction, may admit of
some question ; but the instruction must be read in the
light of the evidence and in connection with all the other
instructions given. In so considering it, we perceive no
ground for supposing that it was misleading to the jury, nor
do we perceive that there was any error in the ruling of the
court thereon.

In the eighth prayer of the defendants, the court was re-
quested to instruct the jury, that if they found that the
article complained of as libellous was not composed and
published, or procured to be composed and published by the
defendants *as an entirety,* as charged by the plaintiff, then
their verdict should be for the defendants. This was re-
jected, and the defendants excepted. The court, in our
opinion, was clearly right in rejecting this prayer. The
proposition involved has been disposed of in what we have
already said in regard to the main question of publication,
and in considering the questions presented by the instruc-
tions granted at the instance of the plaintiff. *Parker* v. *Pres-
cott, supra.*

The defendants set up the defence of privileged commu-
nication, and by their thirteenth prayer they requested the
court to instruct the jury that the letter of February 13,
1894, signed John Leetch, general manager, is a privileged
communication, and before they could find a verdict against
the defendants they must find the existence of malice against
the plaintiff—that is, an intention to injure the plaintiff—
as the motive of the defendant or defendants in writing
such letter, and their verdict must be in favor of any and
all the defendants in whom no malice or intent to injure
the plaintiff was shown to exist at the time of the writing
of said letters. This application for instruction was re-
jected, and the defendants excepted ; and this ruling of the
court is assigned as error.

This request to declare the letter of the 13th of February, 1894, a privileged communication, had nothing, either of law or fact, to support it. In the first place, that letter is not the libel declared on; it is only a part of the evidence to show the authority, aid and assistance furnished for composing and publishing the libel set out in the declaration. In the next place, the occasion of the publication furnished no privilege to any of the parties. The writing complained of was not composed and published in pursuance of any right or duty, legal or moral, private or public, on the part of the defendants. The defendants were under no obligation to furnish the data or information requested by Brown to be published in "The Progressive Age;" or to enable him to compose and publish the libellous article complained of. By furnishing the data requested, knowing the purpose for which it was to be used, they incurred the responsibility for the act of Brown, to the extent of the authority, aid and assistance given. If, however, the letters written by Leetch to Brown, could be regarded as privileged as between themselves, they certainly could not furnish matter to be entitled to privilege that was intended to be published in a public journal or periodical. The privilege, if it were conceded to exist as to the letters of Leetch, could not extend to the publication of the contents or substance of those letters in a public journal or periodical, issued for circulation among the public generally. *Phil., Wilm. & Balto. R. Co.* v. *Quigley*, 21 How. 202. In such publication the libellous article would lose all the right to privilege which it might otherwise claim. Without the protection of privileged communication, the publication of a libel is a wrongful act, presumably injurious to the party to whom it relates, and in the absence of legal excuse gives a right of recovery irrespective of the intent of the defendant who published it; and this although he had reason to believe the statement to be true, and was actuated by an honest or even commendable motive in making the publication. *Holmes* v. *Jones,* 147 N. Y.

59. The question of damages depends upon other consid-
erations.   It is clear, therefore, the court was right in reject-
ing the thirteenth prayer of the defendants.

There is a question raised in this court, by assignment of
error, which was not raised or passed upon in the court below;
and that is as to the sufficiency of the verdict of the jury.
As we have already stated, the action was brought against
five defendants, and they all pleaded jointly the general
issue plea of not guilty.   The verdict was rendered against
three of the defendants, and there does not appear to have
been any finding at all as to the other two.   This was a
defective verdict, and if a motion in arrest of judgment had
been made, it would have been set aside.   But there is no
such motion made, and the defendants against whom the
verdict was found were content to allow judgment on the
verdict to be entered against them.   After suffering judg-
ment to be entered on the verdict without question, it is too
late now, in this court, to raise the question as to the validity
of the verdict and judgment thereon.   Every intendment
must be made in support of the verdict and judgment.
After judgment entered, it may well be presumed that the
defendants who were not included in the verdict of guilty
were intended to be found not guilty; as in the cases of *Gulf,
etc., R. Co.* v. *James,* 73 Texas, 12, and *Lockwood* v. *Bartlett,*
7 N. Y. Supp. 481.   Or, it might well be presumed, that on
the plaintiff taking judgment against the three defendants
found guilty on the general issue, that he, by implication
and intendment, discharged the other defendants by way of
*nolle prosequi,* which could be entered as well after as before
verdict, and even after judgment.

"In cases of tort against several defendants, though they
*all join* in the same plea, and are found jointly guilty, yet
the plaintiff may, after verdict, enter a *nolle prosequi* as to
some of them, and take judgment against the rest.   The
reason is said to be, that the action is in its nature *joint and*

*several*; and, as the plaintiff might originally have commenced his suit against one only, and proceeded to judgment and execution against him alone, so he might, after the verdict against several, elect to take his damages against either of them." *Minor* v. *Mechanics' Bank*, 1 Pet. 46, 74; *Ward* v. *Taylor*, 1 Pa. St. 238. There can be no question of contribution as between the defendants, if that were supposed to be material.

Upon the whole case, we find no ground for reversal of the judgment, and the same must be affirmed; *and it is so ordered.*                          *Judgment affirmed.*